Argued and submitted March 3, affirmed April 30, 1997

In the Matter of Mark Rohlffs,
Minor Child.

STATE ex rel JUVENILE DEPARTMENT
OF WASHINGTON COUNTY,
*Respondent,*

*v.*

MARK ROHLFFS,
*Appellant.*

(J94-0622; CA A91778)

938 P2d 768

Lynn M. Travis argued the cause and filed the brief for appellant.

Pilar C. French, Assistant Attorney General, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

## WARREN, P. J.

■    Child appeals from a juvenile court order that found him within the jurisdiction of the court on the ground that he possessed less than one ounce of marijuana within 1000 feet of a school, an act that, if committed by an adult, would be a Class C misdemeanor. ORS 475.999(2). He argues that the discovery of the marijuana was the result of an illegal detention and search. We review *de novo*, ORS 419A.200(5), ORS 19.125(3), and affirm.[1]

In April 1995 child, who was then 14 years old, was a student at an alternative high school in Hillsboro. Two other students at the school independently came to Loughner, a vice-principal at the school, and told her that child probably had drugs on him. Both informants were good students who held jobs and had proven truthful in the past. Loughner knew that child made statements strongly asserting his right to have marijuana and that he had been in counseling for drug problems.

Loughner and Johnson, a teacher at the school, called child out of class, searched his locker with his permission, and then took him to a small classroom that was not in use. They covered the window in the door of the room with paper and asked child to empty all of the pockets in his jeans and jacket. He complied except for one pocket in his jacket that he refused to empty. Loughner and Johnson asked him to empty that pocket several more times, but he continued to refuse. Neither attempted to take the jacket from him. Child became upset, and Loughner left a message for his father, who was a teacher at another school. After getting the message, child's father came to child's school, probably arriving within 15 to 30 minutes of the beginning of the incident. He found child upset and focused his efforts on calming him down.

---

[1] Although the state argues otherwise, our *de novo* review of juvenile cases extends to motions to suppress. *See, e.g., State ex rel Juv. Dept. v. Finch*, 144 Or App 42, 44, 925 P2d 913 (1996). The trial court, which had the opportunity to observe the witnesses, expressly found that they were credible, "although they all saw things very different[ly]." We find no reason to disagree with that conclusion.

Child's father stayed at the school for 20 to 30 minutes. When he left he thought that child had himself under control. According to Loughner, child told his father that he had marijuana in the jacket pocket; the father denies that child made that statement. At some point while he was upset, and when his father was not present, child attempted to leave the room; Johnson stood in the doorway for about 30 seconds to prevent him from doing so. Loughner testified that child could have left at any time when he was not upset. Child testified that he did not think that he was free to leave.

Loughner ultimately called a police officer to the school. When the officer arrived, he saw child handing his coat to a teacher. The officer asked child if the coat was his and if he could look through it. Child answered "Yes." The officer found marijuana in the coat; child stated that he had brought it to school. There was nothing confrontational about the encounter; although he had a few residual tears in his eyes, child carried on a conversation with the officer with no difficulty. The entire episode, from when child was called out of class until the officer found the marijuana, lasted an hour and a half to two hours.

The decisive issue is whether child consented to the search of his jacket. Child asserts that the state has a greater burden of showing that the consent was voluntary, because the events before the search constituted a stop that was not supported by reasonable suspicion. *See State v. Penney*, 87 Or App 357, 361, 742 P2d 660 (1987). The state responds that there was no stop and that, if there was, it was supported by reasonable suspicion. We turn to that question.

We have long recognized that a school official who conducts a search is a public official subject to constitutional restraints. *State v. Walker*, 19 Or App 420, 424, 528 P2d 113 (1974). We have not, however, previously discussed the conditions under which school officials may detain a student as part of investigating possible criminal activity. The state points out that students are legally required to attend school during school hours, ORS 339.010 *et seq*, and that they have a legal duty to comply with rules governing schools, including submitting to the teachers' authority. ORS 339.250. From that foundation, the state argues that "it makes no sense to

begin the inquiry with whether a valid 'stop' has occurred" and that "it also makes little sense to apply the 'reasonable suspicion' test developed to examine police investigatory stops." Rather, "[e]ven if their suspicion is based purely on rumor, teachers should be able to investigate in order to ensure that the students for whom they are responsible are safe."

■     There is some point to the state's position. Students are at school, and are subject to school rules, for educational reasons and are subject to limitations on their freedom that have nothing to do with any possibility that they are engaged in criminal activity. Those in charge of the school must take reasonable steps to protect students from the effects of criminal activity in which others might engage. Actions to protect the school's educational purposes and the security of its students, including investigating rumors or tips of possible illegal activity, do not necessarily involve stops or other exercises of authority beyond that involved in students' required attendance at school. That is the case even if the investigation includes stopping students long enough to ask them questions.[2]

■     The basic problem with the state's arguments is that they do not relate to what happened in this case. Loughner and Johnson did not remove child from class merely in order to ask him questions as part of their investigation, intending to allow him to return once the questioning was completed. Rather, they searched his locker, took him to an unused classroom, asked him to empty all of his pockets, and kept him in the room when he would not do so.[3] They ultimately called a police officer, telling him that they were having a problem with an unruly child. Those actions go well beyond the restraints and investigation that the compulsory attendance laws by themselves would justify. At least by the time that child's father left, Loughner and Johnson were not checking out a rumor but were attempting to obtain an illegal

---

[2] Many of the same things, of course, can be said of much of what the police do while investigating possible criminal activity among the general public.

[3] Loughner testified that child was free to go so long as he was not upset, but she did not tell him that at the time. Child reasonably interpreted Johnson's blocking the doorway as meaning that he could not leave.

substance that they believed that child was carrying. Because teachers are public officials for these purposes, the detention was a stop and was improper unless it met the reasonable suspicion requirements that are codified in ORS 131.605(4).[4]

■       In *State ex rel Juv. Dept. v. DuBois*, 110 Or App 314, 318, 821 P2d 1124 (1991), we held that a teacher had probable cause to search the child's pack for a weapon. The teacher had information from two good, reliable students that they had seen the child with a gun the previous day and that they had heard that he had one on campus on the day in question. The teacher also knew that a person who brings a weapon to school once is likely to bring it again, while the vice-principal knew that the child had previously had weapons on campus. In this case, two students whom Loughner knew to be reliable independently told her that child probably had drugs on him. Loughner knew that child vocally asserted his right to carry marijuana and had been in counseling for drug problems.

The information that Loughner had was similar to the information in *DuBois*, although it was not as complete. While it did not constitute probable cause, it did provide specific and articulable facts that gave rise to the inference that criminal activity was afoot. It thereby provided reasonable suspicion that justified detaining child in order to investigate. *See State v. Lichty*, 313 Or 579, 584, 835 P2d 904 (1992).[5] That suspicion continued throughout child's detention, in part because of his willingness to allow a search of his locker and clothes with the exception of one specific pocket.

---

[4] ORS 131.605(4) defines "reasonably suspects" to mean that "a peace officer holds a belief that is reasonable under the totality of the circumstances existing at the time and place the peace officer acts * * *." Although this definition does not expressly apply to teachers, the parties assume that it correctly states the reasonable suspicion standard, if such a standard is relevant to this case.

[5] We have described three factors for evaluating when a citizen-informant tip may establish reasonable suspicion in normal circumstances. *See State v. Villegas-Varela*, 132 Or App 112, 887 P2d 809 (1994); *State v. Shumway*, 124 Or App 131, 861 P2d 384 (1993), *rev den* 318 Or 459 (1994); *State v. Black*, 80 Or App 12, 721 P2d 842 (1986). Assuming that those factors are relevant in the school context, Loughner had information about child's involvement with drugs that was independent of the tip and that, together with what she knew about the informants, was sufficient to create reasonable suspicion.

The teachers did not engage in improper activity that might raise the state's burden of proving child's consent to be voluntary.

■     We conclude that, under the totality of the circumstances, child's consent to the search of his jacket was voluntary. Child clearly knew that he had the ability to refuse to consent; he in fact refused a number of times, and Loughner and Johnson honored his refusal. On appeal he emphasizes that he was held in a confined space for an extended period against his will. However, his father was with him for a significant part of that time, reducing whatever coercive effects the detention might otherwise have had. His actions tended to confirm the suspicion that he possessed drugs, and it was not reasonable to return him to class while that possibility remained.

Most significantly, when the police officer arrived he saw child turning his coat over to a teacher, apparently voluntarily. When the officer then asked for permission to search it, child gave permission without any apparent hesitation and without any threats or coercive actions from the officer. He appeared relaxed and was able to carry on a normal conversation. Child knew, from his experience with Loughner and Johnson, that his refusal to permit a search would be honored, but he readily consented to the officer's search. His consent was voluntary.

Child's other arguments do not require discussion.

Affirmed.