Argued and submitted March 3, reversed and remanded June 11, petition for review denied October 7, 1997 (326 Or 62)

In the Matter of
Paul Michael Backer, a youth.

## STATE ex rel JUVENILE DEPARTMENT OF MARION COUNTY,
*Respondent,*

*v.*

## PAUL MICHAEL BACKER,
*Appellant.*

(95J0026; CA A91452)

940 P2d 247

John S. Richardson filed the brief for appellant.

Michael C. Livingston, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

## EDMONDS, J.

The juvenile court for Marion County found child to be within its jurisdiction for having committed acts that, if committed by an adult, would constitute rape in the first degree, ORS 163.375; sodomy in the first degree, ORS 163.405; unlawful sexual penetration in the first degree, ORS 163.411; and sexual abuse in the first degree, ORS 163.427. Child appeals and assigns error to the court's denial of his motion to suppress his tape recorded confession, which was admitted at the jurisdictional hearing. We review *de novo*, ORS 419A.200(5); ORS 19.125(3), and reverse and remand.[1]

The victim, who was not quite four years old when the investigation began, is child's half-sister. A relative noticed what appeared to be blood in the victim's panties. She informed the victim's mother, who called the sheriff's department, which began an investigation. The department arranged for the victim to be medically evaluated to determine the source and cause of the bleeding. The medical examination revealed physical evidence that was consistent with sexual assault. Additionally, the victim identified child as the perpetrator during her medical examination.

A sheriff's deputy went to child's home and asked child's mother to bring child, age 14, and his teen-age sister to the sheriff's office. He did not tell child or child's mother that child was a suspect. When they arrived at the sheriff's office, they were met in the lobby by a detective, a representative of Services for Children and Families (formerly Children's Services Division (CSD)), and Deputy Sheriff Scharn. Pursuant to a prearranged plan of investigation, the investigators separated child from his family members. The CSD representative escorted mother from the lobby to one location, the detective took child's sister to a different location, and Scharn

---

[1] The trial court made no findings of historical fact in support of its conclusion that the confession was admissible. Even though our review in this case is *de novo*, see *State ex rel Juv. Dept. v. Rohlffs*, 147 Or App 565, 567 n 1, 938 P2d 768 (1997), " 'the difficulty which arises in determining the facts in cases of this character could, for the most part, be eliminated if [trial judges] would make findings of fact on all contested evidence underlying [their] ruling[s] * * *.' " *State v. Magee*, 304 Or 261, 263 n 1, 744 P2d 250 (1987) (quoting *State v. Chinn*, 231 Or 259, 262 n 1, 373 P2d 392 (1962)).

directed child to the only interview room at the sheriff's office. Neither child nor mother verbally objected to being separated from each other at that time.

The interview room is a small, irregular-shaped room with recessed, fluorescent lighting. It is furnished with a desk and some chairs. Scharn, who was in uniform, sat on one side of the desk, and child sat on the other side. The door to the interview room remained closed throughout the interview.

At the hearing on the motion to suppress, Scharn testified that at the outset of the interview, he told child that he would not be arrested that day and would be going home with his mother, no matter what child told him. Scharn testified that he believed that he had given child *Miranda* warnings at the beginning of the interview, but had no certain recollection of that event. His written report did not record that *Miranda* warnings had been given, and notes from which the report was prepared had been destroyed. Also, no *Miranda* warnings are contained in the subsequent tape recording of child's confession. Scharn also testified that he did not believe that he was legally obligated to give child *Miranda*-like warnings, because he did not consider child to be in custody.[2] Child testified that Scharn did not tell him at any time

---

[2] On direct examination, in response to the question: "[D]id you at any point in time Mirandize [child], that is read him his Miranda rights?" Scharn answered: "Yeah. I think I did but I can't say for absolute."

On cross-examination Scharn testified as follows:

"[Child's Attorney]: Now you told us that you don't believe, or you're not sure if you advised him of his rights.

"[Scharn]: That's correct.

"[Child's Attorney]: You can't say you did and you can't say you didn't.

"[Scharn]: I believe I did but I can't swear to it that I did.

"[Child's Attorney]: It's clearly not on the tape recording.

"[Scharn]: That's right.

"[Child's Attorney]: Why wouldn't you put that on the tape recording, if you'd done it?

"[Scharn]: I probably would have done it at the beginning of the interview.

"[Child's Attorney]: Now you've got it, is there anything in your report that indicates that you advised this young man of his rights?

"[Scharn]: No, there's nothing indicated in the reports.

"[Child's Attorney]: You typically do with a suspect?

during the interview that he had the right to remain silent, terminate the interview, or that he had a right to have an attorney present. We are not persuaded, based on the totality of the evidence, that Scharn ever gave *Miranda*-like warnings to child. The more reasonable inference is that Scharn never considered the interview to be custodial in nature and, therefore, believed that the warnings were unnecessary.

According to Scharn, he interrogated child for about 15 minutes before child made incriminating admissions. Child testified that Scharn interrogated him for one and one-half hours before he confessed. Child's tape-recorded confession is about 15 minutes in duration. The mother and the sister's testimony corroborates child's testimony about the length of the interview, and we find child's testimony to be more credible in that regard.

Child testified that he repeatedly asked to see his mother and asked for an attorney during the first part of the interview and before he confessed. Deputy Scharn testified:

"[Prosecutor]: Did [child] at some point ask to have his mom present while he talked to you?

"[Scharn]: Yeah.

"[Prosecutor]: When did that happen?

"[Scharn]: *That happened during the first portion of the interview.*

"[Prosecutor]: And how did that happen? Tell us how that came up.

"[Scharn]: We were talking about things and he goes, he said, *he asked if he could go get his mom, or I can't remember his exact words.* And I told him that his mother was being interviewed by [the CSD worker]. And that, you know, when we were done talking that, you know, he could go, he would be going home with his mother. That he wasn't going to be. [*sic*]

"[Prosecutor]: Did he then ask to stop talking to you?

---

"[Scharn]: It depends. I wasn't really legally obligated to do that.

"[Child's Attorney]: And why not?

"[Scharn]: Because he was not in custody."

"[Scharn]: No.

"[Prosecutor]: What would you have done had mom not been in the course of being interviewed? Would you allow—I'll withdraw the question. Why did you want, or was it acceptable to you to interview Paul without his mom present?

"[Scharn]: Yes, that's normally how we do those interviews." (Emphasis supplied.)

We are persuaded from the above testimony that child asked to leave the room during the interview to contact his mother and was denied that ability before he confessed.

Scharn testified that his demeanor was calm throughout the interview and that he made no threats or promises other than that child would be going home with his mother when they concluded the interview. Child testified that Scharn yelled at him, accused him of lying and threatened to "lock [child] up for a few days." Child testified that he admitted to the acts with which he was eventually charged because he was fearful of Scharn.

■■ The issue is whether the state has demonstrated on these facts that child's confession was voluntary. *State v. Ely*, 237 Or 329, 332, 390 P2d 348 (1964). Under Article I, section 12, of the Oregon Constitution[3]

"a defendant who is in 'full custody' must be given *Miranda*-like warnings prior to questioning. In addition, such warnings may be required in circumstances that, although they do not rise to the level of full custody, create a 'setting which judges would and officers should recognize to be "compelling." ' " *State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990) (internal citations omitted).

Assuming that child was not in "full custody," the question became whether the attendant circumstances "compelled" child to testify against himself. In turn, that decision depends on

---

[3] Article I, section 12, of the Oregon Constitution provides:

"No person shall be * * * compelled in any criminal prosecution to testify against himself."

Defendant makes no assignment of error or argument under the United States Constitution.

"whether a reasonable person in child's position—that is, a child of similar age, knowledge and experience, placed in a similar environment—would have felt required to stay and answer all of [the police officer's] questions." *State ex rel Juv. Dept. v. Loredo*, 125 Or App 390, 394, 865 P2d 1312 (1993).

The case law is instructive on the issue. In *Loredo*, a case also involving a juvenile suspected of sex offenses, we stated:

"[T]he trial court found that child was told at the outset of the meeting that he was not under arrest, did not have to speak and could leave if he wanted to. It also found that he was in familiar surroundings, he was not subject to punishment for refusing to answer the officer's questions, the officer was not in uniform, no firearm was displayed, and no additional authority figures were present during the interview. Although the school interview was 'the first time [child] had talked to a police officer,' the court concluded that child's familiarity with visits to the principal's office and child's 'attitude' about going there reduced the 'fright factor' associated with the visit." *Id.* at 394.

We concluded that based on the "totality of the circumstances, the setting in which the interview took place was not 'compelling.' " *Id.* at 395.

In *State v. Magee*, 304 Or 261, 744 P2d 250 (1987), the defendant and his brother were involved in a fight at a rodeo dance. The trial court found:

"Defendant came voluntarily to the Sisters Police Station to ascertain the status of his brother who was in custody. He observed his brother having a scuffle with the police officers in the police station and desired to approach the area where his brother was at. The police officers restrained him from doing so. The Defendant then indicated that he would leave. *He was told that he was not free to leave at that time because he had been involved in a fight.* The officer desired to learn the identity of the Defendant for purposes of future investigation.

"The Defendant was then ushered into a separate office. He was told to take a seat. And after a dispute about the Defendant sitting down, the Defendant seated himself. The

officer informed the Defendant that he needed the Defendant's name and asked the Defendant, 'What happened at the rodeo dance between you and John Stroup?' The Defendant replied nothing and then indicated as a result of the subsequent question, 'He got what he deserved. It stemmed from a prior dispute,' and that the officer wouldn't understand.

"No Miranda warnings were ever given. There was no physical restraint. The Defendant was never told not to leave except for the one situation that I mentioned previously. There were no threats or promises made to the Defendant. The officer testified that if the Defendant had refused to identify himself, the officer would have arrested him." *Id.* at 363-64. (Emphasis supplied.)

The Supreme Court concluded: "When this defendant was told by an officer investigating assault charges that he could not leave the police station because he was involved in a fight, this constituted 'custody' adequate to require a warning before questioning." *Id.* at 266.

The facts of this case closely resemble the facts in *Magee*. Unlike the child in *Loredo*, child was in the unfamiliar setting of a sheriff's office interview room, being interviewed by a uniformed officer. He had been purposefully separated from his mother for purposes of the interview. Scharn did not give child *Miranda*-like warnings. In fact, when child asked to exercise his constitutional right to terminate the interview in order to contact his mother, Scharn refused the request. Instead, he told child:

"And that, you know, *when we were done talking* that, you know, *he could go*, he would be going home with his mother." (Emphasis supplied.)

Even if the circumstances were not "compelling" before child made his request, they became so when child sought to leave the interview room and was prevented from terminating the interview. We hold that a reasonable 14-year-old child under these circumstances would have felt required to stay and answer all of Scharn's questions.

The state argues that Scharn's response to child's request—that he would be going home with his mother

"when [they] were done talking"—somehow vitiates the compelling nature of the circumstances. The clear implication of that response, however, is that Scharn, not child, would determine when the interview was over and that child could not leave until Scharn permitted him to go. The fact that Scharn said that child would be free to leave *after* they were done talking does not change the fact that a reasonable child would have felt required to stay and answer all of Scharn's questions *before* he would be allowed to go home. In that sense, the circumstances were not different from the circumstances in *Magee*. We conclude that the juvenile department has not carried its burden of demonstrating that child's confession was voluntary. The trial court erred by denying child's motion to suppress his confession.

Because the confession is highly probative on all the offenses with which child is charged, its admission into evidence in the jurisdictional hearing could not have been harmless. Therefore, we conclude that the trial court should have the initial opportunity to consider the juvenile department's allegations in the light of our disposition of child's motion to suppress.

Reversed and remanded.