Argued and submitted September 13, affirmed November 22, 1995

In the Matter of Elias Stephen Doty,
a Minor Child.

STATE ex rel JUVENILE DEPARTMENT
OF WASHINGTON COUNTY,
*Respondent,*

*v.*

Elias Stephen DOTY,
*Appellant.*

(J94-0230; CA A86204)

906 P2d 299

Lisa Rae Pfost argued the cause and filed the brief for appellant.

Douglas Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R.

Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

**EDMONDS, J.**

Child seeks reversal of the juvenile court's adjudication of him to be within the jurisdiction of the court for delivery of a controlled substance. ORS 475.992(1).[1] He makes multiple assignments of error including the trial court's failure to grant his pre-jurisdictional hearing motion to suppress. We review *de novo*. ORS 419A.200(5). *See also State ex rel Juv. Dept. v. Fikes*, 116 Or App 618, 842 P2d 807 (1992) (indicating that we review factual issues *de novo* in motions to suppress in juvenile cases although we give non-binding deference to the trial court's findings regarding the credibility of witnesses). We affirm.

At the time of the adjudication, child was a 17-year-old high school student. The evidence elicited at the hearing on the motion to suppress indicates that on the morning of March 17, 1993, child spoke with his school's vice principal, Horn, in the hallway of the school that he attended. The contact lasted a minute or less, and Horn noted nothing unusual about child during that contact. About 30 minutes later, child came to see Horn in the principal's office to assist Horn in recovering some stolen keys. Flannagan, the campus security officer, was also present in the office. Child had a backpack with him.

Horn testified that during the conversation with child in the office:

> "[Child's] eyes were bloodshot, but also very glassy, almost brilliant in a sense that I've come to recognize as the same state that eyes are in when someone has been smoking marijuana. He was unfocused in his answers. * * * His demeanor appeared to me that he had been smoking marijuana, and I asked him about that. He became evasive and not really wanting to answer, and was not looking at me."

Horn was familiar with child because of other disciplinary contacts in the past and had talked to him previously about drug problems and issues. Because of child's demeanor, Horn inquired whether child had used a controlled substance in the interval between the two conversations. According to Horn,

---

[1] ORS 475.992(1) prohibits the delivery of marijuana for consideration. Under ORS 475.005(8), delivery "means the actual, constructive or attempted transfer" of a controlled substance.

child eventually admitted to him that he had smoked marijuana during that time and gave Horn permission to search his backpack. When Horn searched the backpack, he discovered a bag of marijuana.

Child's version of the events differs. He testified that he was called back into the office after the conversation about the keys ended. He went up to the desk and placed his book bag on it.

"A:  [A]s we were leaving, I was walking over to the door and he said, come here. And I walked up, put my bag on the corner of the desk. He goes, your eyes look a little bloodshot. You been smoking weed? And I said, no, I'm just a little tired. And he goes, I don't think so. I've got reasonable doubt [*sic*] to search you and please empty your pockets. And I wouldn't. I said, no, I'm not going to do that.

"* * * * *

"Q:  What happened then? How did the bag get searched?

"A:  He grabbed it, searched it and while — during the search he told me, empty your pockets and I wouldn't. And he searched it and found that first bag."

Child also testified, contrary to Horn's testimony, that he did not admit to having smoked marijuana before Horn found the bag of marijuana in the backpack.

Horn left the room after he found the bag of marijuana in child's backpack. At that point, child and Flannagan remained in the room together. Child testified that Flannagan told him that if he would not empty his pockets, he would be arrested by the police, handcuffed and searched.[2] Consequently, child took out a second baggie of marijuana and gave it to Flannagan. When Horn returned to the room, the second baggie was on the conference table in the room.

At some point, Horn called the police. Eventually Officer Groth arrived and spoke with child. Groth testified that he gave child *Miranda* warnings. At some point during the *Miranda* explanation, child removed another baggie of marijuana from his waistband. Groth also testified that child confessed that he had purchased a $20 sack of marijuana and

---

[2] Flannagan did not testify at the hearing.

had broken it down into three baggies "for the purposes of either future use and/or selling to other students."

Child moved to suppress "all tangible and intangible evidence obtained as a result of a custodial interrogation on or about March 17, 1994," based in part on the prohibitions in Article I, section 9, of the Oregon Constitution and the Fourth Amendment of the United States Constitution against unreasonable searches. At the conclusion of the hearing on the motion to suppress, the prosecutor argued:

"Your Honor, quite simply one individual says that permission was given and admission was made prior to the search. The other individual says that the search was denied and the admission was made after the search was conducted, and that's diametrically opposed. None of the circumstances, nothing in the evidence or the circumstances would lead the Court to conclude that there was any kind of involuntariness here."

The trial court did not rule on whether child consented to Horn's search of the backpack. It said:

"Okay. Well, first of all, starting off, if we looked at federal standards and really we're supposed to stop — start at state, but I'm going to start at federal because it's easy in this case. Clearly under [*New Jersey v. T.L.O.*, 469 US 325, 104 S Ct 733, 83 L Ed 2d 720 (1985)], even assuming that there was not a consent to search the backpack, I would clearly find reasonable suspicion to search the backpack. There was a little more than just glassy eyes, red eyes. Mr. Horn testified that [child] was unfocused. He testified as to how he had seen him earlier and then saw him that day, and also he had seen him in his prior relationships and prior knowledge of [child]. But, most specifically, Mr. Horn has training and experience in detecting people under the influence of marijuana. Even without a statement being made by [child] that he had smoked marijuana, I think there would be the reasonable suspicion sufficient enough under *T.L.O.* to open up the backpack and take a look at it.

"Looking at state law, and we don't have any, I suppose, as far as reasonable suspicion goes, but I would still find probable cause under those circumstances. We have a lot of other cases where somebody appears to be under the influence and it gives police probable cause to do a search within the scope, a reasonable search. And I also would add exigent circumstances in this particular case. Clearly this marijuana could have disappeared.

"At any rate, I am finding, both under the state standard and the federal standards, that probable cause to search [existed]."

In his first and third assignments of error, child argues that the trial court erroneously concluded that Horn had probable cause to search child's backpack and that exigent circumstances justified an immediate search. The state counters that Horn had probable cause to search the backpack and in the alternative that child expressly consented to the search of his backpack.[3]

■■ We believe the threshold issue to be whether child consented to the search of his backpack. The state must prove voluntary consent to a search by a preponderance of the evidence. *State v. Stevens*, 311 Or 119, 137, 806 P2d 92 (1991). The record indicates the following regarding child's consent to search the backpack. Horn testified:

"Q: * * * Okay. After he told you that he had smoked marijuana, how did your conversation progress?

"A: I asked him if I could search his effects. I just had him empty his pockets, go through his backpack. The conversation turned to more of not so much one of trying to get [child] in trouble, but more of, [child] we've been down this road, we've talked quite a bit, you know you have a problem with this, the best thing to do is to just seek help. Let's get some — it was a very personal type of conversation, trying to get him to admit that he had that problem and that we needed to do the search, for him to go ahead and search. I felt I had reasonable suspicion to search his backpack without — I — clearly I did, given Board policy, which I've — which I understand meets the law. A person tells me he has been smoking marijuana he appears to be stoned, then I have reasonable suspicion to assume that I can do a search. But he eventually did let me look through his backpack.

"Q: So it's fair to say then that even though at the outset you in your own mind believe that you can go ahead and do the search, you nonetheless continue to have this conversation with [the child]?

"A: Correct.

---

[3] In *State ex rel Juv. Dept. v. DuBois*, 110 Or App 314, 821 P2d 1124 (1991), we held that Article I, section 9, protections apply to on-campus searches by school officials of public school students' personal articles (in that case, a student's "fanny pack").

"Q: And eventually when he allowed you to do the search, can you tell the judge how that occurred?

"A: I can't honestly remember the exact — how I did that. No, I can't exactly. I would assume I picked up the bag, opened it up and went through it. That's what I've done well over a hundred times in the last two years at Tualatin High School. I don't recall specifically how that occurred, though. I honestly don't.

"Q: Now do you recall whether or not he gave you the bag or not?

"A: I don't recall if he handed it to me or I picked it up. Probably I picked it up.

"Q: Okay. Now, when you say the conversation was personal in this period of time, can you be more descriptive, more specific about what you mean; how it was personal to you and [the child]? And it might help to talk about the subjects you were talking about.

"A: Well, the foundation of this discussion was our previous relationship, in that we had some very open and close conversations in the past about drug use, [the child's] drug use in particular. And, again, he'd been found to be [a Minor In Possession] at a school function, on property of the school earlier that year. And I started by saying, [child], you appear to be very stoned, and I would like to look the other way, but I can't. When you're coming in to give some information that's helping school, part of me says that I just would like to look the other way, but I honestly can't do that. It's not in our best interest. It was along those lines, what was in [child's] best interest. And I firmly believe that somebody being caught with drugs at school, going through the drug and alcohol process of — that we have as far as training, that we recommend as far as training and treatment — is in their best interest. So, in a sense, being caught is a positive thing for the student when it comes to drug habits. So it was along those lines.

"Q: When you looked through his backpack, did you find anything?

"A: Yes. There was a baggie with a small amount of marijuana, a very small amount.

"Q: At this point in time, did you continue to search any further?

"A: I believe that at that point, he did not want to empty his pockets, and I left the room and he continued to speak with

Mr. Flannagan, who also has a personal relationship with [child]."

On cross-examination, Horn's testimony was consistent. Child, however, testified that he did not consent to the initial search of his backpack.

"Q: * * * Okay. And he first asked you if you had been smoking weed, you said. And your response was?

"A: No, I'm just a little tired.

"Q: Was it then that he asked you to empty your pockets?

"A: Yes.

"Q: And you wouldn't allow that?

"A: (No audible response.)

"Q: What happened then? How did the bag get searched?

"A: He grabbed it, searched it and while — during the search he told me, empty your pockets and I wouldn't.

"Q: Did you ever — did he ask you if he could search the bag?

"A: Huh-uh. He just grabbed it. He said, I need to search your bag.

"Q: Did you volunteer the bag to him?

"A: Huh-huh.

"Q: Did you consent for him to search the bag?

"A: Huh-huh.

"Q: You need to answer out loud.

"A: No."

On cross-examination, child admitted that he had lied to Horn about smoking marijuana.

"Q: So you, in fact, lied to Mr. Horn, didn't you, the first time?

"A: Yes.

"Q: And then later you told him that you left the premises to smoke some marijuana, right?

"A: Yes.

"Q: All right. Now, how long were you speaking to Mr. Horn?

"A: At what time?

"Q: During this period of time. How long did — from the first time that you lied to him about not smoking marijuana to the time that Officer Groth got there? How long a period was that?

"A: Probably about a half hour.

"* * * * *

"Q: Okay. What did he say to you? .

"A: He told me to empty my pockets and told me that he had to search me.

"Q: All right. And when you told him you weren't going to allow him to search your pockets and you weren't going to empty your pockets, did he do that?

"A: Did he — could you repeat the question?

"Q: Did he — right. When you told him that you didn't want him to search your pockets and you didn't want to empty your pockets, did he do that? Did he make you empty your pockets? ˙

"A: No.

"Q: Did he search your pockets?

"A: No."

In this *de novo* review of the record, we are required to determine a credibility issue without the benefit of viewing the witnesses and from a cold record. Moreover, we can find nothing in the trial court's remarks from which we can infer whose version of the events the trial court believed. The trial court simply did not reach the issue of consent. Therefore, we turn to the record. Horn's testimony is unequivocal that child consented to the search. Child does not contest that he appeared to be under the influence of marijuana, and moreover, he admitted lying to Horn about using marijuana after the first contact with Horn. Child and Horn agree that Horn requested consent to search child's pockets, but did not conduct a search because child refused consent to search his person. That fact lends further credence to Horn's testimony that child consented to a search of the backpack. If Horn had searched child's backpack without consent, it would seem reasonable that he would also have searched child's pockets without consent, particularly in light of the fact that he found marijuana in the backpack. Based on the totality of the circumstances, we conclude that child voluntarily consented

to the search of his backpack. The trial court did not err in denying child's motion to suppress.

In the light of our disposition of the first and third assignments of error, child's other assignments of error do not require discussion.

Affirmed.