Argued and submitted June 9, 2008, reversed and remanded February 18, 2009

In the Matter of M. A. D.,
a Youth.

STATE ex rel JUVENILE DEPARTMENT
OF CLACKAMAS COUNTY,
*Respondent,*

*v.*

M. A. D.,
*Appellant.*

Clackamas County Circuit Court
031120J02; A132290

202 P3d 249

Angela Sherbo argued the cause for appellant. On the brief was Maite Uranga.

Kaye Ellen McDonald, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

EDMONDS, P. J.

Sercombe, J., dissenting.

**EDMONDS, P. J.**

The issues in this case concern whether the guarantees against unreasonable searches and seizures in Article I, section 9, of the Oregon Constitution are implicated when school authorities search a student and seize contraband which is then used as evidence in a juvenile delinquency proceeding. Youth appeals a judgment finding him within the jurisdiction of the juvenile court for acts that, if committed by an adult, would constitute felony and misdemeanor crimes of possession and delivery of less than an ounce of marijuana within 1,000 feet of a school. *Former* ORS 475.999 (2003), *renumbered as* ORS 475.904 (2005). On appeal, he assigns error to the juvenile court's denial of his motion to suppress evidence obtained when school officials conducted a warrantless search of his person after another student had informed them that youth had marijuana and was trying to sell it at a location near the school campus. We review the facts *de novo* and the legal issues as a matter of law, ORS 419A.200(6)(b) and (8), and reverse.

We find the following facts: In January 2005, Assistant Principal Brooks at Rex Putnam High School summoned to his office a student with whom he was working on attendance and behavior issues. The student had recently transferred from another school where he had been suspended for drug possession. Previously, the student and Brooks had entered into a written behavioral contract. According to the terms of the contract, a failure to abide by the contract could result in the student's detention, notice to his parents, and even suspension. Brooks was aware this student had lied at times in the past and that his tendency was to deflect scrutiny of his behavior away from himself to others. When the student arrived at his office, Brooks confronted him about skipping class to go off campus to smoke; in response, the student told Brooks that he had seen youth before school in possession of marijuana and that youth was trying to sell it in an area close to the school known as "the pit." Brooks was aware that, before and during school, students convened at the pit to engage in drug use and smoking activities. The North Clackamas School District, which includes Rex Putnam, has a written policy precluding students from using and bringing controlled substances to

school, specifically marijuana.[1] Brooks testified that, aside from any illegalities involving marijuana use, drug possession is "in direct opposition to what we're trying to accomplish as educators and trying to help kids learn and how to be productive citizens." He explained that drug possession causes discipline problems and attendance issues. Taking into account his prior contacts with the student, Brooks testified that he took the student's statements about youth "seriously, based on [the] student's past, who he hung around with and some of his own activities and where he said it occurred. I judged that to be accurate."

Brooks was familiar with youth but had not had any previous direct interaction with him after youth had transferred to Rex Putnam in the fall of that school year. Brooks's familiarity arose from individual education plan (IEP) meetings regarding youth. Based on the concerns about school attendance on youth's IEP, Brooks surmised that there was a possibility that drugs and alcohol had played a role in youth's absences from school.

Based on the above information, Brooks summoned youth to his office. When youth arrived, he was accompanied by a staff learning specialist, Pogel. Youth's school counselor was also present when Brooks confronted youth with the allegations made by the other student. Initially, youth did not admit to any drug-selling behavior or to the possession of any drugs. Brooks testified that he then explained to youth that, "based on the way the school district has worked in the past, that I had what was called reasonable cause to search[.]" He then called youth's mother at her work to inform her that they were planning to conduct a search of youth. Brooks recalled in his testimony that "she expressed * * * that she thought [youth] probably was holding something." Pogel also expressed the belief, based on the way youth was acting, "that he probably had something illegal in his possession." At her request, youth spoke to his mother on the phone—while still in Brooks's office and with the three adults present.

---

[1] The policy was not introduced into evidence at the hearing on youth's motion to suppress the evidence seized from him, and the state does not rely on the theory that it was entitled to search youth's person based on the provisions of the policy.

After the phone conversation ended, Brooks asked youth to turn his pockets inside out. Youth complied by turning out his pants pockets and the outside pockets of his leather jacket. Youth's actions revealed a bulge in the inner breast-pocket of the zipped-up jacket. Brooks asked if he could see what was in the pocket, but youth refused, stating that he did not trust Brooks. Pogel then asked if youth trusted him. Youth replied that he did and unzipped the jacket, revealing the pocket. Pogel reached into the pocket, removed a bag, and dumped its contents onto the counter, including less than an ounce of marijuana, some plastic bags, and a pipe for smoking marijuana. Youth thereafter confirmed that the marijuana was his and that he was trying to sell it.

The school officials did not raise their voices at any time during the meeting, nor did they coerce or threaten youth. None of the school officials testified that, during the time period when youth was not cooperative, he was acting in an agitated or belligerent manner, or that he made any furtive movements. In addition, youth was never physically restrained nor told that he could not leave, although he would have had to pass by at least one adult in order leave the room.

Subsequently, the state filed a delinquency petition with the juvenile court. Youth moved to suppress the evidence from the jacket, as well as his statements made thereafter, under Article I, section 9, of the Oregon Constitution.[2] The juvenile court denied his motion, leading to this appeal. The threshold issue on appeal is whether youth consented to the search. Juveniles are entitled to the protections found in Article I, section 9, of the Oregon Constitution. *Roberts v. Mills*, 290 Or 441, 444, 622 P2d 1094 (1981); *State ex rel Juv. Dept. v. DuBois*, 110 Or App 314, 318, 821 P2d 1124 (1991). However, consent to a search is a recognized exception to the warrant requirement. *State v. Paulson*, 313 Or 346, 351, 833 P2d 1278 (1992). To uphold a search based on consent, the state must prove by a preponderance of the evidence that the

---

[2] Article I, section 9, of the Oregon Constitution provides, "No law shall violate the right of the people to be secure in their persons * * * against unreasonable search, or seizure; and no warrant shall issue but upon probable cause[.]"

consent was voluntary. *State v. Stevens*, 311 Or 119, 136-37, 806 P2d 92 (1991).

With regard to the issue of consent, the juvenile court reasoned that, once Brooks told youth that he would be searched, "[Youth] was not faced with a decision whether to *consent* to the search; he was faced only with the decision whether to *cooperate* with a search. After speaking with his Mother, he chose to cooperate * * * but such cooperation is not 'consent to search.' " (Emphasis in original.) We agree with the court's reasoning, because the state did not carry its burden of persuasion that youth voluntarily allowed Pogel to remove the contents of his jacket pocket. As we said in *State v. Guzman*, 164 Or App 90, 99, 990 P2d 370 (1999), *rev den*, 331 Or 191 (2000), the mere acquiescence to the exercise of governmental authority without a reasonable opportunity to make a choice to consent does not constitute a consent to search for purposes of Article I, section 9. Here, Brooks informed youth that he had "reasonable cause to search" and asked him to turn his pockets inside out. Youth complied but refused to permit any further search. At that point, Pogel intervened, apparently relying on his personal relationship with youth, which led to youth unzipping the jacket and Pogel's retrieval of its contents. No intervening event occurred between Brooks's declaration that he had reasonable cause to search and youth's acquiescence to Pogel's intervention that persuades us that the state has carried its burden.

The state next argues that the school officials had probable cause to search youth, and thus, the search comported with the requirements of Article I, section 9. The juvenile court ruled, "When Mr. Brooks decided to search, he certainly had grounds to suspect [Youth] had sold drugs that morning, and that he *might* still possess drugs, but the evidence does not rise to the level of 'probability' that marijuana would be found on [Youth's] person." (Emphasis in original.) On appeal, the state argues that there was probable cause to search youth because of the information given to Brooks by the informant student, Brooks's knowledge that the "pit" was a location used by students for drug activities, Brooks's perception "that [youth] appeared to be hiding something" when

he came into Brooks's office, and the appearance of the bulge inside youth's jacket.

We do not question Brooks's and Pogel's authority as school officials to confront youth based on the information that they had acquired, to search him, and to seize contraband in his possession that could pose a risk to the safety of other students or that could interfere with the school's educational mission. However, in order for the state to use the evidence derived from those actions in a delinquency proceeding under the juvenile code, the requirements of Article I, section 9, must be satisfied. Article I, section 9, requires that a search warrant issue upon probable cause. An exception to the warrant requirement is when a search is based on probable cause and exigent circumstances. As applied to the circumstances of this case, Article I, section 9, requires that the school officials act with probable cause and exigent circumstances to believe that youth was in possession of a controlled substance—that is, that it was more likely than not that youth was in possession of illegal drugs at the time of the search. Intuition or suspicion can be a valuable aid to the making of inquiries that may lead to the disclosure of information that could give rise to probable cause, but intuition or suspicion cannot serve as a substitute for the articulation of objective facts required by the constitution. *State v. Evans*, 110 Or App 46, 53, 822 P2d 1198 (1991).

Generally, in criminal cases, the state bears the burden of proving that a warrantless search is justified by probable cause and exigent circumstances. *State v. Tucker*, 330 Or 85, 89, 997 P2d 182 (2000). Probable cause to search lawfully exists under Article I, section 9, when a reasonable person would believe that seizable things will more likely than not be found in the location to be searched. *State v. Anspach*, 298 Or 375, 380-81, 692 P2d 602 (1984). This case does not involve a criminal prosecution but a prosecution under the juvenile code. Nonetheless, school officials are deemed by the law to be government actors subject to the restrictions on searches imposed by Article I, section 9, and the exclusionary rule under Article I, section 9, applies to the searches of students if the seized items are used as evidence

in a prosecution under the Code. *State ex rel Juv. Dept. v. Doty*, 138 Or App 13, 18 n 3, 906 P2d 299 (1995); *DuBois*, 110 Or App at 318; *State v. Walker*, 19 Or App 420, 424, 528 P2d 113 (1974); *see also State ex rel Juv. Dept. v. Finch*, 144 Or App 42, 46, 51, 925 P2d 913 (1996) (holding that, in conducting searches of students, school officials act as agents of the government).

Here, although the student informant was an informant whose identity was known to Brooks and who could have been subject to sanctions if he had given false information to Brooks, he was also known as a person who had lied at times, who had attempted to deflect scrutiny of his own behavior to others, and who "was quick to give up other people if he thought it would take the heat away from him." Brooks also relied on his independent knowledge that students in general used the pit area to engage in drug use and smoking activities and his surmise that drugs and alcohol had played a role in youth's absences from school. However, whether *youth,* as distinguished from other students, had engaged in those activities at the pit on the day in question depended entirely on the credibility of the student informant's report.

The state also relies on youth's demeanor when he first came into Brooks's office and the appearance of a bulge in youth's pocket. According to Brooks's testimony, youth appeared uncomfortable "as if he was hiding something." However, Brooks agreed that youth's demeanor could have been attributable to the fact that he had been compelled to come to Brooks's office, and Brooks did not refer in his testimony to any observable facts or furtive actions from which an objective factfinder could draw a reasonable inference that youth was hiding an object on his person. Moreover, the bulge in youth's pocket was revealed only after youth was required to turn his pockets inside out. The state also relies on Pogel's testimony that, based on youth's comments that "this is stupid" or "this is dumb" in response to Brooks's allegations, "it seemed the way [youth] was acting that he probably had something illegal in his possession." In addition, the state points to youth's mother's comment that he "probably was holding something."

■	Ultimately, in this case, whether there was objective probable cause to search youth depends on the credibility of the student informant's accusation that youth was in possession and attempting to sell marijuana at the pit before school. None of the other information by itself establishes more than mere suspicion that youth was in possession of controlled substances at the time that he was confronted by Brooks, and none of that information provides objective corroboration of the informant's accusation. On this record and in light of the informant's personal history regarding credibility, we cannot conclude that it is more likely than not that the informant's report to Brooks was credible. We are therefore required to conclude that the state has not carried its burden of proving probable cause on this record.[3]

■	Finally, the state argues that probable cause is not required under the circumstances of this case in order to satisfy Article I, section 9. Rather, according to the state,

"[e]ven if the facts did not establish probable cause, they did provide reasonable grounds for the search, and the search was reasonable in scope. The Fourth Amendment [to the Constitution of the United States[4]] permits a search under those circumstances, and because of the special nature of schools, this court should hold that Article I, section 9, of the Oregon Constitution also permitted the search in this case."

The trial court agreed with the state's argument, concluding that

"[s]chool officials had reasonable grounds for suspecting that a search would reveal evidence of a violation of law and school rules. The scope of the search was reasonably related to the circumstances justifying the search. Under the Fourth Amendment, and under Article I, § 9, the search was valid."

---

[3] Consequently, we need not decide whether the state demonstrate an exigency.

[4] The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

It reasoned that,

> "[t]o protect children, it is reasonable to apply a more flexible standard than probable cause to determine whether the acts here in question violated the rights of Child under Article I, [section] 9. To avoid confusion, the standard should be the same under Oregon's Constitution as it is under the Fourth Amendment."

In the past, we have found it unnecessary to reach the issue of whether the constitution permits school authorities to conduct a search based on less than probable cause, either because we have determined that probable cause and exigent circumstances justified the search, *see State ex rel Juv. Dept. v. Gallegos*, 150 Or App 344, 347-48, 945 P2d 656 (1997), *DuBois*, 110 Or App at 318; because there was not even reasonable suspicion for the search, *see Finch*, 144 Or App at 47, *State ex rel Juv. Dept. v. Stephens*, 175 Or App 220, 227-28, 27 P3d 170 (2001), *State ex rel Juv. Dept. v. Rohlffs*, 147 Or App 565, 571, 938 P2d 768 (1997); or because the search was justified by the youth's voluntary consent, *see Doty*, 138 Or App at 21-22. This case presents squarely that previously undecided question.

That question was answered by the United States Supreme Court under the Fourth Amendment in *New Jersey v. T. L. O.*, 469 US 325, 327-28, 347-48, 105 S Ct 733, 83 L Ed 2d 720 (1985), a case involving a search of a student's purse by a school official. Before reaching its conclusion, the Court pondered:

> "How, then, should we strike the balance between the schoolchild's legitimate expectations of privacy and the school's equally legitimate need to maintain an environment in which learning can take place?"

*Id.* at 340. It then held that, "when there are reasonable grounds for suspecting that [a] search will turn up evidence that the student has violated or is violating either the law or the rules of the school," a search of the student's person or belongings is justified. *Id.* at 342.

In *DuBois*, we summarized the Court's reasoning in *T. L. O.*:

"The Court held that Fourth Amendment protections apply to searches of students by public school officials, the 'underlying command' being that the search be reasonable. It held, however, that the school setting was not conducive to application of the warrant requirement because of the need for prompt and informal discipline and the need to maintain safety in the schools. Further, the Court held that the same considerations justified relaxing the probable cause standard that would otherwise be applicable. In determining the degree of suspicion necessary to validate the search, the Court balanced the state's need to search against the student's legitimate expectation of privacy. It held that the state's substantial interest in maintaining discipline and security in the school environment, which depends on informal and flexible disciplinary procedures, weighed against application of the probable cause standard and justified a more flexible 'reasonableness' standard. The inquiry, it said, is whether the search was reasonable under all of the circumstances."

*DuBois*, 110 Or App at 317. However, we observed in *DuBois* that

"[t]here is no precedent in Oregon for a balancing of interests approach in determining whether the warrant requirement applies. Generally, the failure to obtain a warrant may be excused only if the circumstances fit within one of several recognized exceptions."

*Id.* at 318.

Our observation in *DuBois* informs the following analysis. "Unlike Article I, section 9, of the Oregon Constitution, which protects against intrusions into a person's protected privacy interests, the Fourth Amendment protects a person's reasonable expectation of privacy." *State v. Sanders*, 343 Or 35, 43, 163 P3d 607 (2007); *see also State v. Caraher*, 293 Or 741, 749-50, 653 P2d 942 (1982) (holding that states are free to impose greater restrictions on government activity based on their own constitutional provisions than those that the United States Supreme Court imposes with regard to federal constitutional provisions). In contrast, a search occurs under the Oregon Constitution when a privacy interest is invaded, *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986), and does not depend on the privacy that one expects but on the privacy that one has a right to expect from the government. Thus, a

balancing test such as the Court used in *T. L. O.* is inapplicable, because the privacy interest guaranteed by the Oregon Constitution is "one of right, not of expectation." *State v. Tanner*, 304 Or 312, 321 n 7, 745 P2d 757 (1987). Consequently, the privacy interests protected from unreasonable searches under Article I, section 9, are defined by an objective test of whether the government's conduct would impair an individual's interest in freedom from scrutiny. "If no privacy interest is implicated, no 'search' has occurred under Article I, section 9." *State v. Wacker*, 317 Or 419, 425, 856 P2d 1029 (1993).

Here, youth had a privacy interest in the contents of his jacket pocket even though he was on school grounds. When school officials ordered youth to reveal the contents of his pockets, they invaded youth's privacy interest in the contents of his pocket. As a juvenile, he is entitled to the protections of Article I, section 9. It necessarily follows that a "search" as defined by Oregon law occurred. As we have previously held, the school officials in this case lacked probable cause to conduct a search of youth's jacket. Nonetheless, the state urges that high school students may be subjected to increased scrutiny within the confines of the school day and on school grounds, because school officials are charged with protecting the welfare of their students and promoting an environment that is conducive to learning. The state concludes therefore that an intrusion into privacy rights like the one that occurred in this case "always has been and continues to be an accepted social norm." It follows, in the state's view, that the search of youth's jacket, while a "search," was not an "unreasonable" search.

It is correct, of course, that Article I, section 9, provides protection only against unreasonable searches, not reasonable searches. But as we observed in *Weber v. Oakridge School District 76*, 184 Or App 415, 431, 56 P3d 504 (2002), *rev den*, 335 Or 422 (2003), what constitutes an "unreasonable search" is

> "not something capable of precise determination. Consistently with that reality, * * * the nature of the constitutional standard will depend on the purpose of the search in each case. Thus, in criminal cases, the courts routinely

state that warrantless searches are *per se* unreasonable unless they fall within a well-established exception to the warrant requirement."

One such exception to the warrant requirement involves non-criminal administrative searches. Accordingly, in *Smith v. Washington County*, 180 Or App 505, 43 P3d 1171, *rev den*, 334 Or 491 (2002), we held that certain security procedures implemented as a condition of entry into a county courthouse constituted a "reasonable search" under Article I, section 9, because they were conducted for a purpose other than enforcement of the law by criminal sanctions. But in this case, the state does not rely on well-established exceptions to the warrant requirement based on the school district's administrative policy; nor is the district's administrative policy part of the record before us. Moreover, the state seeks to use the evidence in this case in a proceeding involving youth under ORS 419C.005, which provides that the juvenile court has exclusive jurisdiction in any case involving a person under the age of 18 who has committed an act that, if done by an adult, would constitute a violation of the criminal laws of the State of Oregon. On this record, therefore, the search conducted by school officials as agents of the state implicates the protections of Article I, section 9.

The dissent disagrees. It would hold that, in order to promote policies of school discipline and student safety, public school students have a more limited privacy right under Article I, section 9, when they are on school grounds. In support of its proposition, it uses the hypothetical example of a seventh-grade teacher who retrieves a note from an unruly student. As explained more fully below, we believe that the dissent misunderstands the implications of our holding. Initially, however, we observe that we do not have the authority to otherwise rewrite Article I, section 9, to include an exception for school officials conducting searches of high school students on school property; only the drafters of the Article could have written such an exception into Article I, section 9, had that been their intention, and there is no suggestion in the text of section 9 that juveniles are any less secure in their right of privacy against government invasion of that interest than adults. *See, e.g., Roberts v. Mills*, 290 Or at 444 (holding

that a juvenile could not be held without probable cause pursuant to the Article I, section 9, prohibition against unreasonable seizures of persons).

The holding in this case is confined to the facts of this case. For example, this case does not involve the issue of whether school officials can use evidence seized in violation of Article I, section 9, in a school disciplinary proceeding by school officials. Moreover, the exclusionary rule is not necessarily applicable in every context involving evidence seized in violation of Article I, section 9. Rather, the answer to the question of how broadly the exclusionary rule ought to be applied in a particular context is found in the reasons for the rule itself and must be applied on a case-by-case basis. *State ex rel Dept. of Human Services v. W. P.*, 345 Or 657, 202 P3d 167 (2009); *State Forester v. Umpqua River Nav.*, 258 Or 10, 18, 478 P2d 631 (1970), *cited in State ex rel Juv. Dept. v. Rogers*, 314 Or 114, 118-19, 836 P2d 127 (1992).[5] Accordingly, our decision does not inform whether a seventh-grade teacher can lawfully seize a note from an unruly student or whether the exclusionary rule applies to a school disciplinary measure or proceeding.

In summary, we hold that youth did not voluntarily consent to the search of his jacket and that the search occurred without probable cause to believe that drugs would be found in it. We also hold that Article I, section 9, requires that probable cause must have existed before the disputed evidence in this case is admissible in a juvenile delinquency

---

[5] The rationale underlying Oregon's exclusionary rule is to vindicate the personal rights of citizens against unauthorized or illegal searches by denying the state the use of the evidence procured as a result of such a violation so as to effectively restore the citizen to his or her position as if the state's officers had remained within the limits of their authority. *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983); *see also* Ronald W. Messerly, *Development of the Right to Exclude Illegally Seized Evidence in Oregon Under Article I, Section 9 of the Oregon Constitution*, 25 Willamette L Rev 697, 704-10 (1989). The interest in restoring a person to a position as if the state officer had acted within the limits of that authority may not exist when a teacher or an administrator seizes an object from a student in a manner that otherwise violates Article I, section 9, but the seizure is for purposes of school discipline or safety. Under such circumstances, the application of the exclusionary rule could become unnecessary, because the exclusion of evidence is not needed to vindicate the personal right of the student to be secure against illegal searches or seizures. *See State Forester*, 258 Or at 22-23 (holding that other legal remedies such as civil damages, declaratory judgments, or injunctive relief may suffice to vindicate the right at stake).

proceeding. Those holdings lead us to the conclusion that the juvenile court erred in denying youth's motion to suppress.

Reversed and remanded.

**SERCOMBE, J.,** dissenting.

A seventh-grade middle school teacher notices a ruckus in the rear of her classroom. Students have been passing a note, reacting to its contents in a gleeful, but disruptive, manner. One boy hides the note in reaction to the disapproving stare of his teacher, who retrieves the note from his pocket in order to quell the disturbance. The majority would require that this "search" be justified under Article I, section 9, of the Oregon Constitution by a showing of probable cause and exigent circumstances, at least if the evidence is later used in a delinquency proceeding. I believe that the state constitution requires a lesser showing in order to excuse the need for a warrant and to justify the reasonableness of a search of a schoolchild. Because that standard is met by the search in this case, I would affirm the denial of the youth's motion to suppress evidence. I respectfully dissent from the majority's conclusions to the contrary.

As the majority notes, we have not decided in past cases whether the state constitution allows school officials to conduct a search based on a standard of exigent circumstances, together with a showing of less than probable cause that a crime has been committed. 226 Or App at 29-30. This case presents that question. I agree with the majority that the state did not carry its burden of proving probable cause on this record. I would conclude, however, that the school authorities acted on an immediate need to protect schoolchildren from the distribution of dangerous drugs and a reasonable suspicion that a violation of laws or school rules on possession or distribution of drugs had occurred. In my view, that is all that is necessary to justify the search under Article I, section 9.

In *New Jersey v. T. L .O.*, 469 US 325, 105 S Ct 733, 83 L Ed 2d 720 (1985), the United States Supreme Court developed standards to assess the reasonableness of searches of schoolchildren under the Fourth Amendment to the United States Constitution. As we noted in *State ex rel Juv.*

*Dept. v. DuBois,* 110 Or App 314, 317, 821 P2d 1124 (1991), the Supreme Court held that "the school setting was not conducive to application of the warrant requirement because of the need for prompt and informal discipline and the need to maintain safety in the schools" and that "the state's substantial interest in maintaining discipline and security in the school environment, which depends on informal and flexible disciplinary procedures, weighed against application of the probable cause standard and justified a more flexible 'reasonableness' standard."

The majority eschews this approach under Article I, section 9, because

"a balancing test such as the Court used in *T. L. O.* is inapplicable, because the privacy interest guaranteed by the Oregon Constitution is 'one of right, not of expectation.' *State v. Tanner,* 304 Or 312, 321 n 7, 745 P2d 757 (1987). Consequently, the privacy interests protected from unreasonable searches under Article I, section 9, are defined by an objective test of whether the government's conduct would impair an individual's interest in freedom from scrutiny."

226 Or App at 32. Once the majority identifies *any* privacy interest or right, it concludes that a warrantless search is " '*per se* unreasonable unless [it] fall[s] within a well-established exception to the warrant requirement.' " 226 Or App at 33 (quoting *Weber v. Oakridge School District 76*, 184 Or App 415, 431, 56 P3d 504 (2002), *rev den*, 335 Or 422 (2003)).

With all respect to the majority, I believe that the distinctions are more nuanced. It is one thing to reject subjective expectations as the basis on which to define protected privacy interests under Article I, section 9, as the court suggested in *State v. Tanner,* 304 Or 312, 321-22, 745 P2d 757 (1987), and held in *State v. Campbell,* 306 Or 157, 164, 759 P2d 1040 (1988). It is quite another thing, however, to conclude that the existence of an objective privacy right, held in common under Article I, section 9, is not a function of the social and legal context of that privacy right. *Campbell* recognized that Article I, section 9, privacy rights are affected by "social and legal norms of behavior." *Id.* at 170.

The contextual nature of privacy rights is nowhere more apparent than in the contrast of the court's decision in *Campbell* with the holding in *State v. Meredith*, 337 Or 299, 96 P3d 342 (2004). In *Campbell*, the court held that police attachment of a radio transmitter to a car and use of the transmitter to locate the defendant was a "search" under Article I, section 9, and violated the defendant's "right" under the state constitution. In *Meredith*, the court held that a "search" did not occur through attachment of a radio transmitter to a pickup truck used by the defendant but owned by his employer. The court rejected the argument that the right of privacy under Article I, section 9, is defined by how the "conduct, if engaged in wholly at the discretion of the government, would impact the general privacy interests of 'the people.' " 337 Or at 305. Instead, the proper inquiry is to assess "whether the defendant had * * * a protected privacy interest in light of the particular context in which the government conduct occurred." *Id.* at 306. The different contexts in *Campbell* and *Meredith* yielded different results under Article I, section 9, *for the same governmental conduct.*

The status of a person who is being seized or searched is one part of that context. That is the key reason why prisoners, probationers, and parolees enjoy fewer privacy rights under Article I, section 9, than other citizens. In *State v. Sanders*, 343 Or 35, 163 P3d 607 (2007), the court upheld a state statute subjecting convicted felons to collection of blood or buccal samples for purposes of DNA profiling. The court reasoned:

> "Defendant argues that Article I, section 9, which provides that 'no law' shall infringe on the 'people's' right to be free from unreasonable searches and seizures, imposes a limit on the government's power that is not dependent on the status of the person who asserts it. However, as is evident from our discussion above, we think that there are constitutionally sound reasons to distinguish between suspicionless searches of and seizures from the general public and such searches of and seizures from the far more narrowed class of prisoners, probationers, and other conditional releasees who have been convicted of felonies. The first group is made up of presumably law-abiding citizens

who are entitled to all the rights afforded by our constitution, but the other is composed of lawfully adjudicated criminals whose proven felonious conduct substantially heightens the government's interest in identifying and monitoring them. The conduct can and does properly carry lasting consequences. It follows that what we may view as constitutionally unreasonable when done to those in the first group we appropriately may view as permissible when done to those in the second."

*Id.* at 42-43 (footnote omitted).

Similarly, I believe that a constitutional distinction should be made between the status of schoolchildren in the context of a search to maintain school discipline or safety, and the status of an adult citizen in the context of a criminal investigation. To me, it is evident that a school setting creates particular needs of students to be free from violence, distraction, and disorder that inhibit a student's ability to learn and the functioning of the school. That collective need is part of the context that defines any student "right" of privacy. That context excuses the need for a warrant under Article I, section 9, in order to maintain safety or to allow immediate and effective discipline of students. It also requires that the reasonableness of a search be evaluated on a case-by-case basis and in light of the degree of threat to school safety or discipline, rather than on whether probable cause exists to conclude that a crime has been committed.

I dissent for those reasons.