233 P.3d 437 (2010)
348 Or. 381
In the Matter of M.A.D., a Youth.
STATE ex rel. JUVENILE DEPARTMENT OF CLACKAMAS COUNTY, Petitioner on Review,
v.
M.A.D., Respondent on Review.
(CC 031120J02; CA A132290; SC S057403).
Supreme Court of Oregon, En Banc.
Argued and Submitted February 22, 2010.
Decided June 10, 2010.
*438 Paul L. Smith, Assistant Attorney General, Salem, argued the cause and filed the brief for petitioner on review. With him on the *439 brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.
Angela Sherbo, Juvenile Rights Project, Portland, argued the cause and filed the brief for respondent on review.
Morgan Smith, Salem, filed a brief for amicus curiae Oregon School Boards Association.
Nancy J. Hungerford, The Hungerford Law Firm, Oregon City, filed a brief for amici curiae Centennial School District, Eagle Point School District, Hermiston School District, and Neah-Kah-Nie School District.
Professor Carrie Leonetti, pro hac vice, University of Oregon School of Law, Eugene, and Rankin Johnson IV, Portland, filed a brief for amicus curiae Oregon Criminal Defense Lawyers Association.
BALMER, J.
This juvenile delinquency case requires us to decide when a public school official's search of a high school student for illegal drugs is permissible under Article I, section 9, of the Oregon Constitution. We conclude that, when school officials at a public high school have a reasonable suspicion, based on specific and articulable facts, that an individual student possesses illegal drugs on school grounds, they may respond to the immediate risk of harm created by the student's possession of the drugs by searching the student without first obtaining a warrant.
After school officials received a tip from a named student that the youth who is the subject of this proceeding (youth) had been attempting to sell drugs earlier that morning near school property, one of the school officials reached into youth's pocket and discovered marijuana and other contraband. The state filed a delinquency petition, alleging that youth had committed an act that, if committed by an adult, would constitute delivery of a controlled substance. In the delinquency proceeding, youth moved to suppress the marijuana that school officials had found on his person, arguing that the school officials had violated his rights under Article I, section 9, of the Oregon Constitution. The juvenile court denied youth's motion. Youth appealed, and the Court of Appeals reversed, holding that the search of youth was invalid because the school officials lacked probable cause to believe that youth possessed illegal drugs. State ex rel. Juv. Dept. v. M.A.D., 226 Or.App. 21, 202 P.3d 249 (2009). The state petitioned for review, arguing that the Court of Appeals had erred in concluding that the school officials' search of youth violated Article I, section 9, and we allowed review.
Before this court, the state concedes that the school officials did not have probable cause to search youth. The state asserts, however, that the appropriate standard for determining the validity of a search by a school official under Article I, section 9, is the "reasonable suspicion" standard, rather than the probable cause standard that the Court of Appeals applied. Under that standard, the state argues, the search was permissible.[1] Youth maintains that the Court of Appeals was correct in applying the probable cause standard and in concluding that the evidence should be suppressed because the facts here did not establish probable cause. For the reasons that follow, we reverse the decision of the Court of Appeals.

I. FACTS AND PROCEEDINGS BELOW
We take the facts from the juvenile court record. On January 7, 2005, Brooks, the assistant principal at Rex Putnam High School, called a student into his office to discuss concerns about the student's attendance and performance in school. When Brooks confronted the student about skipping school to smoke, the student responded by telling Brooks that he had seen youth attempting to sell marijuana that morning in an area near the school commonly referred to as "the pit." Brooks took the student's report seriously, based on the student's prior history with drugs, on "who [the student] *440 hung around with," and on Brooks's knowledge that students often used drugs in the area known as the pit. Although the student informant had previously promised to go to class or finish his homework and not followed through, he had never falsely accused another student of wrongdoing. According to Brooks, the student "was quick to give up other people if he thought it would take the heat away from him"; however, Brooks believed that in making the allegations regarding youth, the student was not only attempting to take attention away from himself, but also was providing Brooks with accurate information about youth possessing marijuana on school grounds. Brooks had not had any interactions with youth, and, until that day, Brooks had not had any particular concerns about youth and drug use. However, Brooks knew that youth's records from schools that he had previously attended noted "target behaviors * * * about attendance and possible indication of drug and alcohol issues."
Based on the foregoing information, Brooks was concerned that youth might have sold or attempted to sell drugs to other students and might have drugs in his possession. As a result, he called youth to his office, where Brooks and youth's counselor were waiting for him. Youth arrived at the office with a staff learning specialist, Pogel. Brooks informed youth that a witness had indicated that youth might be in possession of drugs and asked youth if there was "anything he needed to tell me or that he wanted to show me." At that point, youth did not admit to possessing or attempting to sell drugs; he simply responded by saying, "This is stupid" or "This is a dumb thing." Brooks told youth that he had "reasonable cause to search [him]" and then called youth's mother "as a courtesy" to inform her that they were planning to search youth. During Brooks's conversation with youth's mother, she "expressed * * * that she thought [youth] probably was holding something."
Brooks allowed youth to speak to his mother, and, afterward, youth indicated that he was willing to turn his pockets inside out. Youth then emptied his pants pockets and the outside pockets of his jacket. Brooks noticed a bulge in the inner breast pocket of youth's jacket and asked youth to empty that pocket. Youth refused, stating that he did not trust Brooks. Pogel asked if youth trusted him; youth responded that he did. Pogel then asked if he could look inside youth's pocket, and youth responded by unzipping his jacket. Pogel reached into the inner pocket of youth's jacket, pulled out a cloth bag, and dumped the contents of the bag on the counter, revealing a plastic bag with marijuana in it, about half a dozen empty plastic bags, and a small pipe used for smoking marijuana. Youth admitted that the marijuana was his and that he had attempted to sell it. Brooks then called the police to report what they had discovered.
The state filed a delinquency petition with the juvenile court, alleging, among other things, that youth had committed an act that, if committed by an adult, would constitute delivery of a controlled substance. Youth moved to suppress both the evidence found in his jacket and his confession, arguing that the school officials had violated his rights under Article I, section 9, of the Oregon Constitution.[2] The juvenile court concluded that reaching into youth's pocket constituted a search and that the school officials did not have probable cause to believe that youth had drugs in his possession. The court nevertheless upheld the validity of the search, concluding that it was "reasonable to apply a more flexible standard than probable cause" in the context of a school search. In the absence of Oregon appellate cases addressing the application of Article I, section 9, to a search of a public school student by school officials, the juvenile court used the standard applied by the United States Supreme Court in Fourth Amendment cases. Specifically, the juvenile court relied upon the Court's holding in New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), *441 that such a search does not require "probable cause," but is valid if the official has "reasonable grounds for suspecting" that the search will reveal evidence of a violation of law or school rules. The court concluded that, here, the school officials had reasonable grounds for suspecting that youth had drugs in his possession and that the search was reasonable in scope; it therefore denied youth's motion and subsequently found youth to be within the jurisdiction of the juvenile court.
Youth appealed, and the Court of Appeals reversed in a divided opinion. The majority first observed that juveniles are entitled to the protections of Article I, section 9. M.A.D., 226 Or.App. at 25, 202 P.3d 249. Because the school officials had conducted a warrantless search of youth, the majority proceeded to determine whether the search came within any exception to the warrant requirement. It found that the state had not proved that youth had consented to the search or that the school officials had probable cause to believe that youth possessed illegal drugs. Id. at 25-29, 202 P.3d 249.[3] The majority then turned to the state's alternative argument that the court should adopt an exception to the warrant requirement, similar to that discussed in T.L.O., that would permit school authorities to conduct searches if they reasonably suspected that a student possessed illegal drugs, even if they could not establish probable cause. The majority rejected that argument as inconsistent with the protection of privacy interests afforded by Article I, section 9. Id. at 31-32, 202 P.3d 249. It therefore concluded that the juvenile court had erred in denying youth's motion to suppress.
The dissent agreed that the state had not proved that the school officials acted with probable cause; however, in the dissent's view, the search was nonetheless "reasonable" under Article I, section 9, because the school officials had "reasonable suspicion that a violation of laws or school rules on possession or distribution of drugs had occurred." Id. at 35, 202 P.3d 249 (Sercombe, J., dissenting). As noted, the state sought review, which we allowed to address the appropriate standard for determining whether the search for drugs in this case was constitutional.

II. ARTICLE I, SECTION 9, ANALYSIS
The threshold inquiry in any Article I, section 9, analysis is whether the government action at issue constitutes a "search" for constitutional purposes. State v. Wacker, 317 Or. 419, 426, 856 P.2d 1029 (1993). This court has repeatedly emphasized that Article I, section 9, protects individuals' "privacy" interests and that, as a result, when government conduct invades those privacy interests, a search has occurred for purposes of the state constitution. See, e.g., State v. Howard/Dawson, 342 Or. 635, 640, 157 P.3d 1189 (2007) (stating principle). Although a Fourth Amendment search occurs when government conduct infringes an individual's reasonable expectation of privacy, "`the privacy protected by Article I, section 9, is not the privacy that one reasonably expects but the privacy to which one has a right.'" Id. at 643, 157 P.3d 1189 (quoting State v. Campbell, 306 Or. 157, 164, 759 P.2d 1040 (1988)) (emphases in Campbell).
The privacy rights protected by Article I, section 9, include the right of "the people" to be free from unreasonable searches or seizures of their "persons, houses, papers, and effects." Here, at Brooks's request, youth emptied several of his pockets. However, when Brooks asked him to empty a specific pocket in his jacket in which Brooks had observed a bulge, youth refused. After youth unzipped the jacket, Pogel opened the jacket so that he could see inside the inner pocket, reached into that pocket, and removed what he suspected wasand what proved to becontraband. Those facts present a classic example of a warrantless "search" for purposes of Article I, section 9. *442 See State v. Hall, 339 Or. 7, 11, 20, 115 P.3d 908 (2005) (applying Article I, section 9, to evidence officer obtained by reaching into defendant's pocket).
Having determined that the school officials conducted a search of youth, the next question is whether that search was valid under Article I, section 9. Ordinarily, a warrantless search is per se unreasonable, and therefore invalid, unless it comes within one of the exceptions to the warrant requirement that this court has recognized. State v. Meharry, 342 Or. 173, 177, 149 P.3d 1155 (2006). Although the state concedes that the school officials had no warrant to search youth, it does not rely on any of the exceptions that this court has identified in past cases. In particular, it does not contend that the search was conducted pursuant to an appropriate statutorily authorized administrative program, which, as we have held, may justify a search without a warrant and without any individualized suspicion at all. See State v. Atkinson, 298 Or. 1, 8-10, 688 P.2d 832 (1984) (so holding). Nor does the state argue that youth voluntarily consented to the search or that the telephone call that the school officials made to youth's mother constituted a request that she consent to a search of youth. See State v. Paulson, 313 Or. 346, 351-52, 833 P.2d 1278 (1992) (describing consent exception to warrant requirement). As noted, the state also concedes that probable cause was lacking here, thus making unavailable to the state another well-recognized exception to the warrant requirement a search based on a combination of probable cause and exigent circumstances. See State v. Machuca, 347 Or. 644, 652-57, 227 P.3d 729 (2010) (warrantless search permissible if officer has probable cause to believe that crime was committed and exigent circumstances exist).
Instead of relying on a previously established exception to the warrant requirement, the state urges us to hold that searches of public school students that are conducted by school officials, on school grounds, and during school hours, are constitutionally permissible if school officials have "reasonable suspicion" that the search will reveal evidence of a crime or a violation of school rules. In other words, the state argues that the ordinary level of certainty necessary for a searchprobable causeshould not apply in the school setting and that this court should adopt the approach that the United States Supreme Court took in interpreting the Fourth Amendment in T.L.O.
The state bases its argument for a "reasonable suspicion" test for school searches on the "unique mission and circumstances of public schools." Specifically, the state points to the schools' mission to educate children and argues that "school officials must take reasonable steps to foster that learning environment." According to the state, the school contextincluding the responsibility of protecting students from harm, maintaining order, and fulfilling the schools' educational missionmakes it inappropriate to hold school officials to the "probable cause" standard applicable to searches by law enforcement officials. Instead, the state argues, this court should adopt the less exacting "reasonable suspicion" test that the Court used in T.L.O. We agreein partwith the state's argument.
The state is correct that the unique context of the school setting distinguishes school searches from searches conducted by law enforcement officers in other settings.[4] Oregon statutes require children to attend *443 school, unless they come within a specific exemption. ORS 339.010. For that reason, large numbers of children are required to gather each day in an institutional setting where government employees are responsible for their safety and education and where the necessity for "swift and informal disciplinary procedures," T.L.O., 469 U.S. at 340, 105 S.Ct. 733, is apparent. Further, various statutes emphasize the responsibility of school districts to provide a safe school environment for students, teaching faculty, and classified workers, see, e.g., ORS 339.315 (requiring reporting to officials of any persons believed to possess unlawful firearms in a school); ORS 339.250(3) (authorizing suspension or expulsion of student who assaults or menaces a school employee or other student), and our cases recognize the "special duty arising from the relationship between educators and children entrusted to their care." Fazzolari v. Portland School Dist. No. 1J, 303 Or. 1, 19-20, 734 P.2d 1326 (1987). From the classroom to the cafeteria to the sports field, we require students to follow the directions of teachers and other school officials in order to preserve the safety of all students and further the schools' educational objectives.
We conclude that the school context is sufficiently different from the setting in which ordinary police-citizen interactions occur to justify an exception to the warrant requirement in certain circumstances, and we turn to the scope and application of the state's proposed exception. First, we describe what we view as the closest analogy to that exception, the long-standing and well-defined "officer-safety exception" to the warrant requirement of Article I, section 9. Under the officer-safety exception, a police officer may take "reasonable steps"including a limited searchto protect the officer or others if, "during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present." State v. Foster, 347 Or. 1, 8, 217 P.3d 168 (2009) (quoting State v. Bates, 304 Or. 519, 524, 747 P.2d 991 (1987)) (internal quotation marks omitted). The officer-safety exception is necessary because of the unique circumstances to which it applies:
"`A police officer in the field frequently must make life-or-death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations. Our inquiry therefore is limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made.'"
Id. (quoting Bates, 304 Or. at 524-25, 747 P.2d 991). As noted, the officer-safety exception requires reasonable suspicion of an immediate threat of serious physical injury to the officer or others, based on specific, articulable facts. In assessing whether an officer's actions are permitted based on those facts, the court "asks only whether safety precautions chosen by the officer were reasonable under the perceived circumstances." Id. at 11, 217 P.3d 168. Because such "reasonable steps," which may include at least a limited search, do not violate Article I, section 9, evidence of wrongdoing obtained as a result of the search will not be suppressed.[5]
In our view, the concerns underlying the officer-safety exception also apply to some searches conducted by school officials. As described above, the school context characterized by compulsory attendance and large numbers of students and educators present each day in a relatively confined arearaises heightened safety concerns. As persons responsible for maintaining a safe learning environment, when school officials perceive there to be an immediate threat to student or staff safety at a school, they must *444 be able to take prompt, reasonable steps to remove that threat. As with an officer-safety search, when a school official develops a "reasonable suspicion," based on "specific and articulable facts," that a particular individual on school property either personally poses or is in the possession of some item that poses an "immediate threat" to the safety of the student, the official, or others at the school, the school official "must be allowed considerable latitude to take safety precautions." See Foster, 347 Or. at 8, 217 P.3d 168 (quoting Bates, 304 Or. at 524, 747 P.2d 991) (internal quotation marks omitted). Moreover, as this court has noted with respect to an officer's judgment in that context, it is not our function to "uncharitably second-guess" the considered protective actions taken by school officials. See id. (quoting Bates, 304 Or. at 524, 747 P.2d 991) (internal quotation marks omitted).
For the same reasons that we have applied the less exacting "reasonable suspicion" standard, rather than the probable cause standard, to determine whether a limited officer-safety search is permissible under Article I, section 9, we conclude that the reasonable suspicion standard should apply to a search, like the one here, for illegal drugs that is conducted on school property by school officials acting in their official capacity. We do not mean to suggest that the officer-safety doctrine and a school official's search of a student for drugs are identical in all respects. However, we agree with the state that the public school setting and the obligation of school officials to provide a safe learning environment requires that they be able to respond quickly to credible information, based on specific and articulable facts, about immediate threats of serious harm to students and staff, such as the presence of illegal drugs on school grounds.
There are important limits on the kinds of searches that may be permitted under this approach. Consistently with the standards that we have developed in the officer-safety cases, a school official may not rely on generalizations about suspected drug use or on information that is not specific or current. Moreover, we specifically reject the state's request that we adopt, in this case, a general rule that all school searches should be subject to a "reasonable suspicion" standard. The state's argument that we should follow T.L.O. and sanction warrantless searches whenever a school official has reasonable suspicion that a student possesses evidence of a violation of a school rule or policy goes further than necessary to decide this case. This case involves a present threat to student safety and a search by a school official acting in his official capacity and in furtherance of his responsibility to protect students and staff; our holding is based on those circumstances. The permissibility of other kinds of searches by school officials is not before us.
As we have stated above, high school students, like other citizens, have privacy rights that are protected by Article I, section 9, against unreasonable intrusions by state officials. Those rights, however, like the rights of a person searched pursuant to a valid officer-safety search, must yield if the state officials can point to specific and articulable facts that reasonably create a risk of immediate and serious harm to the officials or others. See Foster, 347 Or. at 8, 217 P.3d 168 (stating test). If the protective actions taken by the school officials are based on those facts, and are reasonable, their conduct does not violate Article I, section 9. See id. at 9-11, 217 P.3d 168 (applying test).
Applying that test here, we conclude that the school officials reasonably suspected that youth possessed illegal drugs at the time of the search and had sought to distribute those drugs to other students earlier that morning. Another student told Brooks that he had seen youth that morning at the pit attempting to sell marijuana. Brooks knew of the informant's background with drugs and that students often used drugs at the pit. He also knew from youth's records from schools that he had previously attended that youth had possible drug issues. When Brooks called youth's mother, she expressed her opinion that youth "probably was holding something." The record in this case demonstrates that Brooks was aware of specific, articulable facts that would lead a reasonable person to suspect that youth was then in possession of illegal drugs. Moreover, *445 Brooks reasonably could have concluded that youth's possession and alleged attempt to sell those drugs earlier that morning created an immediate risk of harm to youth and to other students at the school. Those facts justified the actions of Brooks and Pogel, including Pogel's conduct in reaching into youth's jacket pocket and removing the bag that contained drugs and drug paraphernalia. Pogel's search was reasonable in scope in light of the information that he had, the immediate safety risk presented, and the bulge that Brooks had observed in youth's pocket. The steps that Brooks and Pogel took were reasonable precautions in the circumstances and were not unreasonably intrusive. Their actions thus did not violate Article I, section 9.
Because the actions of the school officials did not violate youth's Article I, section 9, rights, the evidence that they recovered should not have been suppressed. The juvenile court correctly denied youth's motion to suppress.
The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.
NOTES
[1] Because the state now relies only on its argument that the "reasonable suspicion" rather than the "probable cause" standard applies to school searches, we do not address or decide whether the state is correct in conceding that the school officials did not have probable cause to search youth, as the trial court and the Court of Appeals determined.
[2] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."
[3] Consent to a search is one exception to the warrant requirement. State v. Paulson, 313 Or. 346, 351, 833 P.2d 1278 (1992). Similarly, a warrantless search can be justified by a showing of probable cause and exigent circumstances. State v. Meharry, 342 Or. 173, 177, 149 P.3d 1155 (2006). Because the Court of Appeals concluded that the state had not demonstrated probable cause, it did not consider whether exigent circumstances existed. M.A.D., 226 Or.App. at 29 n. 3, 202 P.3d 249.
[4] The state also argues that we should adopt the "reasonable suspicion" standard because school officials are not trained in the "fine legal distinctions between probable cause and reasonable suspicion" and therefore should be required to understand only the lesser "reasonable suspicion" standard. We reject that argument as a basis for our decision. First, we do not decide constitutional requirements based on what is "easier" to understand. Second, the probable cause standard is not any more complicated than the reasonable suspicion standard. Like many constitutional standards, it may present close questions in some cases, but the concept itself is straightforward: Would the facts on which the government actor relied lead a reasonable person to believe that the objects seized will probably be found in the location to be searched? State v. Henderson, 341 Or. 219, 225, 142 P.3d 58 (2006). We reject the probable cause standard for school searches for the reasons discussed in the text, not because the standard is too difficult in application or because school officials have not mastered it in their training.
[5] Our officer-safety cases make it clear that the permissible scope of a search depends on the nature of the safety threat. See State v. Morgan, 348 Or. 283, 290, 230 P.3d 928 (2010) (officer may take "reasonable steps" to protect officer's safety). If the safety threat is based, for example, on reasonable suspicion that the person searched is carrying a rifle, that suspicion would not ordinarily be sufficient to justify a strip search of the person or a search of the person's wallet.