Argued and submitted July 28, 2011, reversed and remanded June 27, 2012

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JOHN LEE MAST,
*Defendant-Appellant.*

### Washington County Circuit Court
C082004CR; A142746

283 P3d 916

Ryan T. O'Connor, Senior Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

David B. Thompson, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Sercombe, Judge.

ARMSTRONG, P. J.

## ARMSTRONG, P. J.

Defendant appeals a judgment of conviction for unlawful possession of a controlled substance, *former* ORS 475.840(3)(a) (2007), *renumbered as* ORS 475.752(3)(a) (2011), raising a number of assignments of error. In his first assignment, he argues that the trial court erred in denying his motion to suppress evidence obtained as a result of an unlawful search of his personal business office by a group of deputies who were carrying out a writ of execution. We agree with defendant that the deputies' entry into his office constituted an unlawful search—a resolution that obviates the need to address defendant's other assignments of error regarding the admission of evidence at trial—and, accordingly, we reverse and remand.

We review a trial court's ruling on a suppression motion for legal error and are bound by the court's findings of historical fact if there is evidence to support them. *See State v. Mitchele*, 240 Or App 86, 88, 251 P3d 760 (2010). We resolve any factual disputes regarding facts about which the court did not make findings in a way that is consistent with the court's ultimate conclusion. *State v. Hall*, 339 Or 7, 10, 115 P3d 908 (2005).

Consistently with that standard, we take the following facts from the trial court's letter opinion and the record of the suppression hearing. Roughly two and one-half months before the search in this case, a plaintiff obtained a money judgment in a civil action against defendant, his business partner, and the company that they owned, Intercard Corp. As a judgment creditor, the plaintiff subsequently sought a writ of execution to collect the money that the defendants owed on the judgment. Shortly thereafter, the judgment creditor obtained a writ of execution—which, pursuant to ORS 18.865,[1] had been issued and signed by a Washington

---

[1] ORS 18.865 provides:

"(1) Except as otherwise provided by law, upon request of a judgment creditor or other prevailing party under a judgment, a court administrator shall issue a writ of execution for any judgment that includes a money award or that requires the delivery or sale of specific real or personal property. * * *

"(2) A court administrator may rely on the information provided by the person seeking issuance of a writ of execution and is not liable for any errors or omissions in that information."

County Circuit Court clerk—directing the Washington County Sheriff to seize and sell the personal property of the judgment debtors, including defendant, to satisfy the judgment.[2] The judgment creditor sent the writ to the sheriff with instructions that identified the personal property to be seized pursuant to the writ to be Intercard's "cash, coin, currency, checks and credit card slips" and all of the judgment debtors' personal property located at Intercard's business premises.

After receiving the writ and the instructions, the Civil Unit Supervisor for the Washington County Sheriff's Office (the supervisor), five other sheriff's deputies, the judgment creditor's attorney, and various property movers went to Intercard's business premises, an office located in a commercial office park. Without forewarning anyone at the business of their arrival—thereby seeking to ensure that no one would move any personal property to prevent its seizure— the uniformed deputies entered Intercard's office during its normal business hours through the unlocked main entrance. Intercard's office had a fairly typical layout: a small reception area with a receptionist immediately inside the main entrance; a number of cubicles throughout the interior; and several smaller personal offices on the perimeter of the space. Defendant had a personal office at the far end of the business office that had a door and, according to the supervisor, "was obviously a private office."

After entering the reception area, the supervisor asked the receptionist for defendant, who was in his personal office at the time, or defendant's business partner. Defendant came to the reception area, and the supervisor gave him a copy of the writ of execution and explained why the deputies were there. No deputy asked defendant or anyone else in the office for consent to go beyond the office's reception area. Some of the deputies proceeded to defendant's personal office and began seizing the property in the office, including office furniture, while defendant gathered personal belongings in his office that had little monetary value—for example, personal photographs on his desk—and that would not be seized.

---

[2] The writ also instructed the sheriff to seize and sell, if the proceeds from the sale of the judgment debtors' personal property were insufficient to satisfy the judgment, real property of the judgment debtors.

Roughly halfway through the seizure process in defendant's office, defendant retrieved a set of keys, which he placed in a box containing his personal belongings. The supervisor responded to defendant's actions by picking up and examining the keys, one of which had the word "Sentry" printed on it. At almost that exact moment, another deputy opened a door of defendant's desk, which was being seized, and found a locked Sentry safe inside. Believing that the safe contained cash or something else of value, the supervisor handed the Sentry key to the other deputy, who unlocked and opened the safe. The deputies found stock certificates and bags of psilocybin mushrooms inside. As a result of that discovery, the state charged defendant with one count of unlawful possession of a controlled substance.

Defendant moved under Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution to suppress the drug evidence that the deputies had discovered in the safe—*viz.*, the psilocybin mushrooms—and statements that he had made to the deputies after the discovery. Relying on *G. M. Leasing Corp. v. United States*, 429 US 338, 97 S Ct 619, 50 L Ed 2d 530 (1977), defendant argued that the deputies had violated those constitutional guarantees by entering his personal office and opening the safe without a warrant and under circumstances in which no exception to the warrant requirement applied. The state responded that the statutory framework authorizing a sheriff to levy on a judgment debtor's personal property pursuant to a writ of execution satisfies the requirements for a warrantless search under the administrative search exception to the warrant requirement and, hence, the deputies' warrantless search of defendant's office was lawful.

The court agreed with the state's argument that the warrantless search performed by the deputies pursuant to the writ was lawful because

"the entry [into defendant's personal office] was not forced. It was consensual. The seizure of the safe was consensual. The opening of the safe was pursuant to a non-discretionary policy and was necessary in order to properly catalogue its

contents. * * * [D]efendant never stated that the safe or its contents were not subject to the execution of the writ."

Accordingly, the court denied defendant's motion.

On appeal, defendant focuses solely on the deputies' entry into his personal office, reprising his argument that the warrantless search of his office violated the state and federal constitutions. In response, the state takes issue with defendant's focus on that search—*viz.*, the deputies' entry into the office—and contends that the legal theory that defendant advanced below was that the deputies needed a warrant to open the safe, not that they needed one to enter his office. Based on the premise that those are distinct challenges, the state asserts that defendant's argument on appeal is not preserved. As to the merits, the state simply contends that the Fourth Amendment case law on which defendant relies is not dispositive because it does not specifically address Oregon's statutory framework for writs of execution.

## I. PRESERVATION

We begin with whether defendant's argument focusing on the search of his personal office is preserved. ORAP 5.45(1).[3] The key consideration informing our resolution of the issue is whether defendant's argument in support of his motion to suppress gave the state and the trial court sufficient information to understand that defendant was challenging the lawfulness of the deputies' entry into his personal office, thereby allowing the state to fairly respond to that challenge and the court to rule on it. *See, e.g.*, *State v. Walker*, 350 Or 540, 552, 258 P3d 1228 (2011) (setting out preservation principle).

Although the state correctly characterizes defendant's suppression effort as focused principally on the lawfulness of the search of the safe, that was not the sole focus. Rather, defendant first alerted the state and the court to his challenge to the search of his personal office when he

---

[3] ORAP 5.45(1) provides, as relevant:

"No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court and is assigned as error in the opening brief in accordance with this rule, provided that the appellate court may consider an error of law apparent on the record."

requested, in his motion to suppress, that the court suppress "the seizure of any and all evidence obtained as a result of an unlawful search of * * * defendant's business establishment." He expounded on that request at the hearing on his motion:

"[The supervisor's compliance with the writ of execution statutes] does not address the privacy interest of someone like [defendant] * * * that there is, separate and distinct from the Sheriff's ability to seize property *out in the open*, there are questions about whether or not the Sheriff can search buildings or property of the defendant and then use that; use the product of that search against * * * defendant in a criminal case * * *."

"And the one case that I found that is controlling on this matter[, *G. M. Leasing*,] does indicate that[,] although the statutory scheme authorizes the levy and authorizes the seizure, it does not authorize the search. And in this case, there are levels of search. There is the opening [of] the desk drawer to find the safe; there is the opening of the safe to find what purported to be the mushrooms."

(Emphasis added.) Moreover, all of the cases that defendant marshaled in support of his motion, including *G. M. Leasing*, focus on whether warrantless searches of various premises— *viz.*, businesses and residences—that were undertaken by government officials to carry out certain civil duties were lawful.

Those aspects of defendant's argument were sufficient to alert the state and the court that defendant was challenging the lawfulness of the search of his personal office and to give the state the opportunity to respond to that challenge. And the state did respond, contending that,

"[i]f this court suppresses the evidence found by the deputies, it can only be because the court finds that the deputies did not have the legal right to be at * * * defendant's business to serve the writ of execution. If the court finds that the deputies did not have the right to be at * * * defendant's business to serve the writ, it must find that the entire procedure currently in place under Oregon law as relating to civil writs of execution is unconstitutional. * * *

"Additionally, in [this] case, unlike the cases cited by * * * defendant, the place that was searched was a business, not a private residence, was entered while open for

business during daytime hours and no forced entry was performed, * * * defendant and many other employees were present throughout the execution of the writ * * *, it was done pursuant to a comprehensive policy that was followed by the letter by executing civil deputies."

Finally, as mentioned above, the court in its letter opinion addressed the deputies' entry into defendant's personal office—concluding that the entry was consensual—which shows that the court was aware that defendant had raised an issue about the lawfulness of the search of his office. Accordingly, contrary to the state's contention, the matter was preserved.

## II. MERITS

We turn to the merits. The critical inquiry in this case is twofold. We must determine (1) whether the deputies' entry into defendant's personal office was a "search" implicating the protections of Article I, section 9,[4] and (2) if so, whether the search was lawful—notwithstanding the absence of a warrant—because the deputies were searching the office pursuant to a writ of execution and such a search falls within the administrative search exception to the warrant requirement.

### A. Search Under Article I, Section 9

There are few legal precepts in Oregon law better established than this: because Article I, section 9, safeguards a person's privacy interests—*viz.*, the privacy to which the person has a right, not an expectation—a constitutionally significant search occurs when governmental conduct intrudes into those interests. *E.g., State ex rel Juv. Dept. v. M. A. D.*, 348 Or 381, 388, 233 P3d 437 (2010). However, despite the axiomatic nature of that principle, determining what constitutes a protected privacy interest can be elusive. The focus tends to be on the place in which a purported

---

[4] Because we resolve this case under Article I, section 9, we do not reach defendant's argument that the evidence should have been suppressed under the Fourth Amendment. *Hall*, 339 Or at 15.

search occurred, because protected privacy interests "generally are not self-announcing and, with a few possible exceptions, can be recognized only by their association with a private place, *i.e.*, by the fact that an object is kept or conduct occurs in a place that legitimately can be deemed private." *State v. Smith*, 327 Or 366, 372-73, 963 P2d 642 (1998) (emphasis omitted).

In that vein, divining whether a person has a cognizable privacy interest in a place requires an assessment of the social norms that bear on whether a member of the public, as opposed to the government official whose conduct is being challenged, would have felt free to enter the place without permission. *See, e.g., State v. Castillo-Salgado*, 186 Or App 605, 609, 64 P3d 1169, *rev den*, 336 Or 60 (2003) ("One indication of whether police conduct constitutes an impermissible invasion of privacy is whether the actions violate social norms."). To discern the norms that would inform a person's conduct, courts look to societal cues that are used by people to determine the appropriate behavior for them to follow in seeking to enter a place. Those cues most often take the form of barriers to public entry into a place—for example, a covering of a window, *see State v. Fortmeyer/Palmer*, 178 Or App 485, 490, 37 P3d 223 (2001), or fences and "no trespassing" signs, *see State v. Dixson/Digby*, 307 Or 195, 211-12, 766 P2d 1015 (1988)—or a lack of such barriers, *see State v. Rodal*, 161 Or App 232, 239, 985 P2d 863 (1999) ("Although a person has privacy interests in the immediate area surrounding his or her residence, it is well established that social and legal norms presume that, in the absence of evidence of intent to exclude others, an occupant impliedly consents to allowing business or casual visitors to walk up to the front door and knock on it.").

Therefore, the predicate issue in this case reduces to whether defendant had a protected privacy interest in his personal office—that is, whether a member of the public who is complying with social norms would have felt free to enter defendant's office without permission. Although Intercard's office was open to the public during its business hours, *cf. State v. Wacker*, 317 Or 419, 426, 856 P2d 1029 (1993) (relying, in part, on the fact that the defendant engaged in criminal activities in a car parked in the parking lot of a tavern

during the tavern's business hours in concluding that the defendant did not have a protected privacy interest in the car), the public nature of Intercard's reception area did not extend to defendant's personal office. That is so primarily because of the layout of the business's premises—*viz.*, a person entering through the main entrance immediately encounters a reception area with a receptionist. The presence of the receptionist—whose role in such a setting is to intercept a visitor entering the building, to discern the nature of the visitor's visit, and, if the visitor must venture beyond the reception area, to obtain permission from the appropriate person to allow the visitor to pass—is a significant and intentional barrier to entry. Moreover, defendant's personal office was at the far end of the main office and had a door to prevent others from entering it, thereby presenting additional barriers to entry.

In light of those cues, a member of the general public complying with social norms would undoubtedly not have felt free to venture past the reception area—much less into defendant's personal office—without permission. The deputies' actions confirm that conclusion. When they entered Intercard's office, they were cognizant of that social norm and acted accordingly, stopping in the reception area and asking the receptionist for defendant or his partner before proceeding past the reception area. Further, the supervisor testified that, based on his observations after entering the building, defendant's personal office "was obviously a private office." Therefore, defendant had a protected privacy interest in his personal office, which the deputies invaded by entering it, and, hence, the deputies' conduct constituted a search under Article I, section 9.[5]

---

[5] Although the legal principles differ between Article I, section 9, and the Fourth Amendment for assessing whether a constitutionally significant search has occurred, *see M. A. D.*, 348 Or at 388 ("Although a Fourth Amendment search occurs when government conduct infringes an individual's reasonable expectation of privacy, the privacy protected by Article I, section 9, is not the privacy that one reasonably expects but the privacy to which one has a right." (Emphasis and internal quotation marks omitted.)), we note that the United States Supreme Court has similarly concluded that the Fourth Amendment's protection extends to business premises, *see, e.g., See v. City of Seattle*, 387 US 541, 543, 87 S Ct 1737, 18 L Ed 2d 943 (1967) ("The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property.").

B. *Administrative Search Exception*

A warrantless search violates Article I, section 9, unless it falls within a recognized exception to the warrant requirement. *E.g., State v. Paulson,* 313 Or 346, 351, 833 P2d 1278 (1992). The state relied on the administrative search exception to the warrant requirement to justify the search, and we discern no other exception that could apply other than that exception, to which we turn.[6]

An administrative search is one that is undertaken for a reason other than the enforcement of laws that carry criminal sanctions. *State v. Anderson,* 304 Or 139, 141, 743 P2d 715 (1987). There are a number of requirements that such a search must meet to come within the administrative search exception, *see State v. Snow,* 247 Or App 497, 504, 268 P3d 802 (2011) (setting out requirements); however, the threshold inquiry that courts must resolve before reaching the other requirements is whether there is a source of legal authority permitting the administrative search, *State v. Atkinson,* 298 Or 1, 8-9, 688 P2d 832 (1984); *see also Nelson v. Lane County,* 304 Or 97, 104, 743 P2d 692 (1987) (stating that an administrative search "could be valid *if it were permitted by a source of authority,* that is, a law or ordinance providing sufficient indications of the purposes and limits of executive authority" (internal quotation marks omitted; emphasis added)). As the Oregon Supreme Court explained in *Atkinson,* "If the government agents had no authority to [search] property, then there can be no lawful intrusion into it. *The inquiry ends there.*" 298 Or at 9 (emphasis added).

_____

[6] The trial court's letter opinion seems to suggest, as quoted above, 250 Or App 609-10 that another warrant exception is also at play: consent. Specifically, the court stated that the search of defendant's personal office was consensual because "defendant did not protest or in any way interfere with the execution of the writ."

To establish the consent exception to the warrant requirement, the state has the burden of proving by a preponderance of the evidence that a person with authority to consent to a search voluntarily gave a government official consent to conduct a search. *Paulson,* 313 Or at 351-52. Even drawing all inferences in favor of the court's statement in the letter opinion, *see State v. Ehly,* 317 Or 66, 75, 854 P2d 421 (1993), the evidence offered by the state at the suppression hearing establishes, at most, that defendant merely failed to oppose the deputies' efforts to search—not that defendant consented to the search. Accordingly, to the extent that the court concluded that the search of defendant's personal office was lawful because defendant had consented to it, the court erred in doing so.

Here, the deputies searched defendant's private office to carry out a writ of execution—not to enforce laws through criminal sanctions—and, therefore, the search was an administrative search. Accordingly, we turn to the deputies' purported source of legal authority to engage in the administrative search: the statutory framework governing writs of execution.

As a general matter, to obtain a writ of execution, a judgment creditor must ask a court administrator to issue the writ, which, depending on the judgment creditor's request, may charge a sheriff to levy on and sell or deliver to the judgment creditor a variety of the judgment debtor's property, including personal property. ORS 18.865; ORS 18.860(1). In particular, as to a judgment debtor's personal property, ORS 18.860(1)(b) provides that a writ may direct the sheriff to

"[l]evy on and sell personal property of the judgment debtor in the possession of the judgment debtor, and deliver the proceeds to the court for application against amounts owing on a money award."

Notwithstanding the writ's general mandate, the judgment creditor to whom the writ is issued must supplement it by providing the sheriff with more specific instructions. ORS 18.875(1). Those instructions must include, among other things, "[a] description of any personal property to be levied on." ORS 18.875(1)(c).

Once the sheriff has the writ of execution and the judgment creditor's instructions, the sheriff must levy on the judgment debtor's personal property in accordance with those directions. ORS 18.878(1). If the writ directs the sheriff to levy on the judgment debtor's tangible personal property, then the sheriff must fulfill his or her duty by "[s]eizing any tangible personal property that the sheriff has not been instructed to secure in the manner provided by ORS 18.880." ORS 18.878(1)(b).[7]

---

[7] ORS 18.880 outlines an alternative seizure procedure that a judgment creditor may choose to instruct the sheriff to follow when levying on tangible personal property, under which a sheriff leaves the property in the judgment debtor's custody and puts a notice on the property indicating that it will be sold. The judgment creditor in this case did not choose to use that procedure.

Despite the expansive nature of the sheriff's authority to seize personal property, the writ of execution statutes do not grant the sheriff unfettered authority to enter enclosed places to find or reach personal property that is subject to seizure. To that end, ORS 18.887 provides, in its entirety:

"(1)   *A sheriff may forcibly enter a structure or other enclosure for the purpose of levying on personal property only pursuant to an order issued by the court under this section.*

"(2)   A judgment creditor may at any time file an ex parte motion requesting a court order directed to a sheriff that authorizes the sheriff to use force to enter a structure or other enclosure for the purpose of levying on personal property pursuant to a writ of execution. Except as provided in ORS 18.255, the motion must be filed with the court in which the judgment was entered. The motion must identify the specific structure or other enclosure to be entered and must contain a declaration under penalty of perjury made in the manner described by ORCP 1 E that reflects facts supporting the judgment creditor's good faith belief that personal property subject to a writ of execution is located within the structure or other enclosure.

"(3)   An order issued under this section shall direct the sheriff to use all force reasonably necessary to enter the structure or other enclosure and levy on personal property pursuant to a writ of execution.

"(4)   A judgment creditor may deliver a copy of an order issued under this section to a sheriff with a writ of execution, or at any time after a writ of execution is delivered to a sheriff. A sheriff may rely on the copy of the order in entering a structure or other enclosure for the purpose of levying on personal property pursuant to a writ of execution."

(Emphasis added.)

Although the text of ORS 18.887(1) makes clear that a sheriff lacks legal authority to "forcibly enter" structures and other enclosures without a court order authorizing the entry, the statute does not expressly address, as pertinent to this case, the circumstances in which the sheriff must have such an order to enter enclosed spaces—that is, in what circumstances a sheriff's entry into an enclosed space will be a

forcible one. To resolve that issue, we turn to the legislative history of ORS 18.887.

The Oregon Law Commission's Judgments and Judicial Sales Work Group was the principal proponent of the 2007 enactment of ORS 18.887, and it submitted written testimony to a Senate committee that explained that

> "[t]he issue [addressed by the statute] is whether there should be a detailed statutory process for and method of authorizing orders in aid of execution that allow the [s]heriff to enter into structures, commercial or residential, and occupied or not occupied. The law is presently silent on this matter. Representatives from [s]heriff[s'] offices expressed a strongly felt need for court direction when asked to enter a structure or other enclosure, in order to protect a sheriff's office from claims of unlawful entry. The Work Group determined that a procedure to obtain such an order should be specified in statute, that the order should allow for the use of reasonable force, and that such an order could then be relied upon by a sheriff in entering a structure or other enclosure for the purposes of levying on personal property."

Testimony, Senate Committee on Judiciary, SB 322, Feb 27, 2007, Ex E (report of Oregon Law Commission). Further, Marshall Ross—a supervisor in the civil unit of the Multnomah County Sheriff's Office who testified before the Senate committee in support of ORS 18.887—explained that, in addition to protecting Oregon "citizens from unreasonable search and seizure by the police," the enactment of ORS 18.887 would resolve the following issue:

> "We have some outlying statutes in ORS [chapter] 206. One[, ORS 206.030,] says that if an order directs a sheriff to * * * seize property at a specific premises, then the sheriff shall * * * publicly demand the return and, if not, forcibly enter the building or enclosure and seize the property. We have another statute[, ORS 206.060,[8]] that says that a sheriff is immune [from liability] if the document presented to the sheriff is regular on its face and appears issued by competent authority.

---

[8] ORS 206.060 provides, "A sheriff is justified in the execution of process regular on its face, and appearing to have been issued by competent authority, whatever may be the defect in the proceedings in which it was issued."

"With those two statutes, there has been a variety of practices going on in the state. Writs of execution are generally issued by a clerical member of the court's staff simply reviewing if there is the existence of a judgment and stamping it and issuing it off to a sheriff. Some creditors will put the location of the property in that writ. * * * Some sheriffs will go out and take [the writ of execution] as the court's blessing that that is the address to which a sheriff is entitled to search and seize. * * * It actually has not gone through any judicial review. It has just been issued by the court clerical staff.

"This mechanism would give creditors the ability to go to court, make a showing to the court, and then give an order to a sheriff from the court that directs the sheriff to a specific address for a specific purpose to seize specific property based upon a specific showing."

Audio Recording, Senate Committee on Judiciary, SB 322, Feb 27, 2007, at 1:00:12 (statement of Marshall Ross), http://www.leg.state.or.us/listn/ (accessed June 20, 2012). One of the statutes to which Ross referred in his testimony, ORS 206.030, provides:

"An officer to whom any process, order or paper is delivered shall execute or serve it according to its command or direction, or as required by law, and must make a written return of the execution or service thereof. If a sheriff is directed by a court to take personal property into custody at a specific premises, and the property is concealed in a building or enclosure, the sheriff shall demand its delivery. *If delivery is not made,* the sheriff shall use such reasonable force as is necessary to enter into the building or enclosure and take the property into possession."

(Emphasis added.)

From that testimony, particularly Ross's reference to ORS 206.030—which requires a sheriff to demand the delivery of the personal property, if the property is concealed, before the sheriff has legal authority to use force to enter an enclosure to retrieve the personal property—we conclude that the legislature intended the court order requirement in ORS 18.887(1) to apply in situations in which the sheriff seeking to enter a structure or other enclosure to seize property under a writ of execution lacks consent to enter the

enclosure and, therefore, must "forcibly enter" it. It follows from that conclusion and the court-order requirement under ORS 18.887(1) that, in a situation in which a sheriff does not have consent to enter an enclosure, the sheriff *does not have legal authority* to enter it unless the sheriff has a court order authorizing him or her to do so.

Here, the deputies did not have consent, *see* 250 Or App 615 n 6, or a court order authorizing them to enter defendant's office. Hence, the deputies' forcible entry into the office was not permitted by ORS 18.887—the only source of legal authority for the search—and, therefore, the administrative search exception does not apply.[9] Because the administrative search exception did not apply to the deputies' warrantless search, the evidence that they obtained as a direct result of the search—*viz.*, the mushrooms discovered in the safe and defendant's subsequent statements—must be suppressed under Article I, section 9. The trial court erred in concluding otherwise.

Reversed and remanded.

---

[9] Because the deputies in this case did not have a court order under ORS 18.887, we express no opinion on whether a search conducted pursuant to such a court order would come within the administrative search exception to the warrant requirement.